*1833.*

*CITY BANK*
*v.*
*BANGS.*

## THE PRESIDENT &c. of the CITY Bank v. BANGS and others.

A participation in a public reward is not wholly incompatible with the duties of public officers or against the policy of the law.

If a particular house or place is to be searched for stolen goods, a warrant should be obtained designating the place particularly and describing the property in the warrant, in order to justify the officer in making a search provided it should prove fruitless.

Still, generally, stolen property may be stopped or taken in any place, either by a private citizen or public officer, without a search warrant; and it is especially the duty of the officer to do it.

When a felony has been committed, a police officer is justified, without a warrant, in examining the trunks, pocket book or other articles of personal property possessed by a boarder, upon the suspicions of the keeper of the boarding-house.

Police officers acting without a warrant, upon the information and at the request of a private citizen, and who are instrumental (through such information) in the recovery of stolen property for which a reward is offered, will not be entitled to the reward merely upon the score of risk assumed or liability incurred in acting without a warrant.

When a reward is offered for the recovery of property, it is extended beyond persons who merely act ministerially. The criterion for determining to whom the reward belongs is this: who is the person that has acquired a knowledge of the facts necessary to a detection or discovery of the thing stolen or lost and has imparted such knowledge with the intent and for the purpose of bringing about a recovery or restoration of the property, taking upon himself the risk and consequences of a failure, and acting with a view to the reward, if his suspicions and disclosures are well founded and successful? In such a case, therefore, the mere officer who acts in his duty will not be entitled. It is not like the case of salvage in the marine law.

A servant, whose information to a mistress may have given the first cause of suspicion of a robber, will not be entitled to any part of a reward offered for the restoration of stolen property, where such information was not given with an intention of inducing the mistress to act or of the servant's becoming an instrument towards its recovery.

The City Bank was robbed. A large reward was offered for the recovery of the property, and a proportionate sum for any part. B., the keeper of a boarding house, from information given him by his wife, suspected a boarder. B. went to a police officer, stated his suspicions, and wished the latter to go with him. He did, accompanied by other officers; none of them had warrants. They were led by B. into his house, who pointed out the trunks of the boarder, he being absent. One of the officers unlocked a trunk and found the stolen money: HELD, that B. was entitled to the whole of the reward.

*July 9th.*
*1833.*

*Public*
*Robbery.*
*Reward.*
*Police officer*
*Warrant.*

This case arose before the Chancellor. The President, Directors and Company of the City Bank had filed a bill of

interpleader; and paid into court the sum of seven thousand four hundred and sixty dollars and ninety cents, being the proportion of a reward of ten thousand dollars offered by them for the recovery of a large sum which had been stolen from the bank.

After the chancellor had ordered a reference to a master, for the purpose of ascertaining who, amongst the defendants, was entitled to the fund: (See 2. Paige's C. R. 570.) The cause was referred to his honor the Vice-Chancellor of the first circuit: and it now came before him on the master's report.

Mr. *R. Bogardus*, for the defendant Henry Bangs.

Mr. *Wm. M. Price*, and Mr. *O. Hoffman*, for the defendants Jacob Hays, Zebulon Homan and Benjamin J. Hays.

Mr. *Mulock*, for the defendant Maria Van Riper.

*Oct.* 21*st.*

THE VICE-CHANCELLOR:—All the parties who are defendants in this cause have taken exceptions to the master's report. Those, of the defendant Henry Bangs, go to exclude the defendants Jacob Hays, Zebulon Homan, Benjamin J. Hays and Maria Van Riper from any participation in the reward which had been offered by the complainants; claiming, for himself alone, the whole of the amount. The exceptions taken by Hays, Homan and Benjamin J. Hays, jointly, do not extend to the entire exclusion of Bangs, for they admit his right to participate, but insist that a greater sum is reported in his favor than he ought to be allowed; that his allowance ought to be diminished and their own increased; while as respects the defendant Maria Van Riper, that she is not entitled to any part. And the defendant Maria Van Riper excepts, on the ground of the smallness of the sum reported in her favor, insisting upon her right to a much larger amount, in common with the defendant Mr. Bangs, alleging how the other defendants, from being public officers, were not entitled to any share or participation in the reward.

Hence none of the exceptions taken adversely to Henry Bangs entirely deny his right. They only go in diminution

of his claim; while those taken by him extend to the whole
right as set up by the other parties. If, therefore, his ex-
ceptions are found to be well taken, there will be an end of
the controversy: for it will follow, as a matter of course,
that he is entitled to the whole of the fund. And, conse-
quently, in this stage of the case, the question is whether the
other claimants are entitled to any thing—and if so, to how
much?

I shall first consider the joint claim of Jacob Hays, Benja-
min J. Hays and Zebulon Homan. These persons were pub-
lic officers attached to the police department. Their gene-
ral duties, as such, are to arrest persons chargeable with of-
fences of a criminal nature and to bring them before a magis-
trate for examination. They are also to search for stolen
property, and, when discovered, to take possession thereof,
with a view to its being restored to the righful owner. For
their services in the discharge of such duties, they are enti-
tled to a stated compensation or to certain fees allowed by
law. It has been contended that public officers ought not to
be permitted to receive gratuitous rewards, because they are
bound to a prompt and vigilant discharge of their duties,
without the hope or expectation of being thus compensated;
the policy of the law, which has in view the safety of the
community, is said to be against it; and self-interest, if they
are allowed to participate in rewards as a remuneration for
services, will cause them to be indifferent and even remiss,
until prompted by what they, themselves, may deem a suffi-
ciently liberal offer; so that no active exertion will be made
to arrest felons or to recover stolen property, without an incen-
tive of this sort. There is considerable force in this argument;
and some illustrations have been given which show how
the practice of allowing public officers to participate in re-
wards may lead to abuse. Still, I am not prepared to say, they
should be entirely excluded. Rewards are offered only when
it is supposed the ordinary means of discovery and detection
would prove ineffectual. They are voluntary offerings and
adapted to what the party making the offer deems to be the
necessity and urgency of the occasion. The object is, to
awaken public attention to the subject, excite vigilance, and
call forth extraordinary individual efforts for the accomplish-

13

*1833.*

CITY BANK
*v.*
BANGS.

ment of the end proposed to be gained. All who choose to engage in it are at liberty to do so ; and he who succeeds becomes entitled to the reward, upon the ground of his superior vigilance or sagacity or of his having used greater exertions or encountered dangers which others were disinclined or not in a situation to hazard. When, therefore, we view the object of rewards, offered thus publicly, in their true light, a participation in their benefits or in the receipt of them cannot be considered wholly incompatible with the duties of public officers or against the policy of the law.

The case of *Weaver* v. *Whitney*, Hopk. 11. was widely different from the present; and the principles upon which it was decided do not apply. In *Hatch* v. *Mann*, 9. Wend. 262. there is a principle bearing more directly upon this subject. It was held that an officer whose duty it was to serve process might recover compensation over and above the fees allowed by law when, on a promise of reward, he uses extraordinary efforts beyond those which an officer is strictly bound to make or which could legally be required of him.

Then, since the law does not exclude public officers from *extra* rewards, I shall proceed to examine the merits of the claim made by these parties, through the facts and testimony in the cause.

The City Bank had been entered by means of false keys and robbed of a large amount of bank notes and money. The directors advertised the same; and publicly offered a reward, in the first instance, of five thousand dollars, but which was increased in a few days afterwards to ten thousand dollars, " for the recovery of the property and a proportionate sum " for any part." On Monday, morning when it was first discovered the Bank had been robbed, one of the police magistrates and three of the officers of the police, being the persons before named, were sent for, and upon being informed of the manner in which the robbery had been committed, the suspicions of the justice and officers were immediately fixed upon Smith and Murray, the two persons who, it was eventually proved, were the perpetrators—indeed, Jacob Hays expressed a confident belief of their being the parties. He and Homan then proceeded to Smith's dwelling-house in Divi-

sion street, and searched it, but without discovering any trace of the stolen property. Smith was from home. The same morning, Benjamin J. Hays was despatched to the south; and, in the afternoon, Homan set out eastward in search of the robbers. The bank advanced money to defray the expenses. In the mean time and during the week Jacob Hays appears to have continued the search in New-York. He called once or twice more at Smith's house and inquired for him of his wife, who, either couldn of or would not give any information as to where he was; and this officer's efforts, whatever they were, did not lead to any discovery of the robbers or of the property. While Benjamin J. Hays and Homan returned with no better success.

During this time, suspicions were excited in the minds of Mr. Bangs and his wife (and especially by the latter) in relation to a stranger, calling himself Jones, who had come to their house as a boarder on the same Monday morning on which the robbery was known; and his conduct was closely observed by Mrs. Bangs. A variety of circumstances transpired from day to day, having a tendency to increase these suspicions; and, finally, on the following Saturday evening, she became so thoroughly convinced of his being the bank robber, and that his trunks contained the stolen property (and which, appearances indicated he was about to remove) that she insisted upon her husband's taking measures to arrest him. Mr. Bangs accordingly determined to do so. He called upon one of his neighbours, a Mr. Hollingshead, to whom he had, the day before, communicated his suspicions, and inquired where he could get an officer to arrest Jones; whereupon Hollingshead went with him to Jacob Hays' house and introduced him to the latter person. Mr. Bangs then communicated his suspicions to Mr. Hays. The latter enquired of he former, if he wished him to go along with him? to which the replied that he did, and stated that he came there to see him for the purpose of having him go and arrest Jones. Mr. Hays then turned to his son, Benjamin, and asked him to walk with them. They all started together for Mr. Bangs' house. Near to it they accidentally fell in with Mr. Homan. Mr. Bangs was the first to enter the house and ascertained that Jones was absent; and then, for greater precaution, he let them all in

through a gate in the rear and conducted them to the back door, through which the party entered, ascended the stairs, and were shown into Jones' apartment. His trunks were in the bed-room adjoining the sitting-room. Mr. Bangs showed Jones' trunks to the officers. They were then drawn into the sitting-room and opened by Benjamin J. Hays with one of his keys; and one of the trunks was full of the stolen bank notes. Upon this discovery being made, the trunks were locked again, replaced in the bed-room, and, at Mr. Bangs' request, the officers remained for the purpose of arresting Jones the moment he should return. For this purpose, Mr. Bangs concealed them in a room below. About twelve o'clock at night, Jones came in and went to his room; and then, Mr. Bangs gave a signal to the officers and accompanied them up stairs, where they arrested him. Jacob Hays and Homan conducted the prisoner to the watch-house, and Bangs and Benjamin J. Hays, assisted by Hollingshead, carried the trunk which contained the money to Jacob Hays's house, where it was deposited for the night—and from thence they all proceeded to the watch-house. The next morning (Sunday) the trunk was removed to the City-Hall, Mr. Bangs being present, where the money was counted and delivered to the president and cashier of the bank.

This is the statement, substantially, given by Hollingshead, upon his examination as a witness, of the discovery of the stolen property and of the arrest of the identical Smith, who had assumed the name of Jones.

I think much depends upon the motive of Mr. Bangs in calling upon Mr. Hays on this occasion and the part which he and the officers acted upon arriving at the house of the former.

It is contended on the part of the officers, that Mr. Bangs only intended to communicate his suspicions and then leave them to act as they might think proper: taking upon himself no responsibility and withdrawing entirely from any participation in the enterprise; and Justice Hopson's testimony is relied upon for the purpose of establishing the fact. It appears by this gentleman's testimony, that, immediately after lodging Smith in the watch-house, Jacob Hays went to Mr. Hopson's dwelling, called him from his bed, and informed

him the money was found and of Smith's being detected. The justice and Hays then went together to the house of the president of the bank, gave him information, and immediately returned to the watch-house. In answer to the question of what was done there? Mr. Hopson states that he inquired of Jacob Hays, in the presence of Homan, Benjamin J. Hays and Mr. Bangs, where the money was found and at whose house? when Jacob Hays informed him (while the persons last mentioned were standing by) that it was found at the house of Mr. Bangs. Strange as it may appear, it would seem not to have occurred to the police magistrate to inquire or Jacob Hays to mention how or where the money had been found until they entered the watch-house and were in the presence of Mr. Bangs. Mr. Hopson then proceeds to state that immediately thereupon a conversation ensued between Benjamin J. Hays and Homan and himself, while Mr. Bangs was present, in relation to the recovery of the money and the detection of the robber and in which conversation Benjamin J. Hays told him, he unlocked the trunk in the upper room with a key which he had in his pocket, while Mr. Bangs was in the lower room, the latter having declared he would take no responsibility upon himself, and that this was stated in such a way as to give the idea of Mr. Bangs' refusal to stay in the room and of his declining to assume any responsibility. The witness says this conversation was loud enough to be heard by the persons present and his impression is that Mr. Bangs must have heard it. Mr. Bangs, it appears, was silent and the witness never heard him say any thing on the subject.

In order to show that either Mr. Hopson is mistaken as to the time and place of this particular conversation or that Bangs did not hear it and is not, by his silence, to be considered as having admitted the truth of Benjamin J. Hays' statement, a number of witnesses, who were present during the whole of the time when the magistrate and parties remained at the watch-house, have been examined.

The testimony of Woodruff and Wells goes far to show that no such conversation did take place there at the time referred to or, if it did, that it was not sufficiently audible to be heard by the bye-standers. They heard no such conver-

1833.

CITY BANK
v.
BANGS.

sation and believe it could not have been heard by Mr.
Bangs: for he and they were close together.   Neither did
the captain of the watch nor the watchmen hear any thing
of it.  From this evidence, it is, at any rate, safe to conclude
that the conversation between the magistrate and officers
was not heard; and, consequently, any statement alleged to
have been made by the latter is not to be received as evi-
dence against Bangs on the ground of his not contradicting it.

There is nothing, then, in opposition to Hollinghead's tes-
timony in relation to the proceedings of Mr. Bangs on Sa-
turday evening or in the manner in which the discovery of
the stolen property or arrest of the thief was brought about.

According to the evidence, Mr. Bangs did not shrink from
the responsibility, but acted throughout as the principal in
seizing the trunks and arresting the felon.   It appears from
Mr. Randell's testimony (which is corroborated) that Mr.
Bangs took legal advice of him on Friday evening as to how
he should proceed, stating his suspicions of the boarder in
his house and the circumstances which gave rise to them.
And, the next evening, when the further circumstances had
transpired which determined him to act, he followed the ad-
vice which Mr. Randell had given him.   This advice was,
to take a person as a witness and go to Mr. Hays and pro-
cure his assistance.   There is no doubt the application was
made to Mr. Hays as an officer of the police and that the ob-
ject of Mr. Bangs was to procure his attendance as such
officer, and that both he and his son Benjamin J. Hays con-
sented to go in their official capacities.   On meeting with
Mr. Homan, he joined them in the same character.

It is said, however, that they had no warrant either to
search or arrest and could not act officially and that, what-
ever they undertook to do was as private citizens and upon
the risk of being deemed trespassers, provided the suspicions
of Bangs proved groundless.   No warrant, indeed, was ever
issued by the police magistrates in the case of this most ex-
traordinary robbery.   Whatever pursuit or search took
place during the week was without authority of warrants.
This affords a strong presumption that, in the opinion of the
magistrates and officers attached to the police, the issuing of
warrants in such a case is unnecessary—especially when
the felony has become notorious.

1833.

CITY BANK
v.
BANGS.

But: what is the law as to the necessity or non necessity of an officer's being armed with a magistrate's warrant? It is true that if a particular house or place is to be searched for stolen goods, a warrant should be obtained designating the place particularly and describing the property in the warrant, in order to justify the officer in making a search, provided it should prove fruitless. Still, without a search warrant, stolen property may be stopped and taken in any place, either by a private citizen or public officer, and it is the duty of the latter more espically to do so, with a view of restoring such property to the rightful owner and of convicting the offender. A warrant is not necessary to render the acts of an officer official in this respect; and he is paid by the public for his services, whether he has or has not a special warrant. In the present case, I cannot believe a search warrant was necessary to justify the officers in unlocking and examining the trunks of this boarder, if he had been innocent. A felony had been committed in the stealing of property of a description likely to be concealed in trunks—Mr. Bangs had reasonable grounds for a suspicion that those brought into his house at this particular juncture contained the stolen property; and this he not only communicated to the officers, but brought them to his house, led them up stairs, and pointed out the trunks which they were to examine. And if, under the same circumstances, he had, in the first instance, pointed out the boarder himself, and—charging him as the bank robber—had required the officers to arrest him and search his person for the stolen money, and they had done so, and on taking him before a magistrate, he had proved his innocence and been discharged, the officers would not have been liable in an action either for false imprisonment or in any other form. If any right of action had thereby accrued, it must have been against Bangs alone. And even he would have been excused in law, if the charge was made upon reasonable grounds of suspicion and in good faith on his part. The law upon this subject appears to be well settled. In *Holley* v. *Mix*, 3. Wend. R. 350. Chief Justice Savage, in delivering the opinion of the Court, examined the English cases; and, upon their authority, lays down the law that if a felony has been committed by the person arrested, the arrest

may be justified by any person without a warrant, and this too whether there is or is not time to obtain one. If an innocent person is arrested by a private individual upon suspicion, the latter is excused for having made such arrest provided a felony had been committed and there was reasonable ground to suspect the person arrested. But, if no felony had been committed, and a private citizen was arrested without warrant, such arrest would be illegal, although an officer would be justified if he acted upon information from another which he had reason to believe was true. If, in the last case, an officer would be justified in arresting the person and taking him before a magistrate for examination, I am at a loss to perceive any good reason why he may not primarily examine the person's trunk, pocket book or other article of personal property which may be placed within the reach of the officer for the purpose of discovering, if possible, the stolen goods, and of ascertaining, with more certainty, the guilt or innocence of the accused. Upon established principles of law (which very wisely extend their protection to officers of this description beyond any other class of individuals during the time of their acting in the discharge of their official duties,) it appears to me they could not have been made liable as trespassers or in any other manner for entering the bed-room of the boarder to which they were conducted by Mr. Bangs himself and there opening the trunks, even if nothing had been discovered to warrant further proceedings. Whatever responsibility was thereby incurred, must have rested on Mr. Bangs and not upon the officers.

In my opinion, therefore, there is no ground for the latter claiming any portion of the reward upon the score of risk assumed or liability incurred in acting without a warrant. They were officers of the police in the discharge of their ordinary duty to the public ; and, although instrumental in restoring the property to its rightful owners, yet they were as the mere conduit through which the recovery was passed. Mr. Bangs was the moving cause; by his means or those which belonged to him the property was recovered; to his vigilance and determination (or to that of his wife's, which is the same thing) the recovery may be fairly attributed. The good sense and meaning of the terms " for the recovery

of the property" as contained in the advertisement extend the promise of remuneration beyond the persons who act only ministerially in the matter. The criterion in these cases ought to be this: who is the person that has acquired a knowledge of the facts necessary to a detection or discovery of the things stolen or lost, and has imparted such knowledge with the intent and for the purpose of bringing about a recovery or restoration of the property, taking upon himself the risk and consequences of a failure, if it fails, and acting with a view to the benefit of the reward, if his suspicions and disclosures are well founded and successful? This principle I think appears in *Fallick* v. *Barber*, 1. M. & S. 108.; and it goes to exclude entirely the claim of the officers to any participation in the reward in question.

Indeed, if they should be entitled to any thing, then there are a number of others who have contributed, in a degree, by their advice and assistance, to the recovery and restoration of the property who, upon the same principle, would be entitled to share, but who have not claimed. Mr. Hollingshead may be mentioned as one. But it is impossible to admit such claims upon any just principle. The rule by which to determine the relative rights of such claimants would be altogether arbitrary. It is not like the case of salvage in the marine law, where the salvors are all engaged in one common enterprise and mutually participate in its perils and dangers. Here, no such circumstance exists applicable collectively to Bangs and the officers.

My conclusion upon this branch of the case is that no right to an equitable apportionment of the reward is established on the part of any of the officers.

There is pretty strong evidence that Jacob Hays, both publicly and privately, in conversation with individuals immediately after the detection and recovery, disclaimed all right to the reward. Still, I do not place much stress upon this circumstance: for, if, upon any sound principle, he was entitled to claim, his declarations thus made would hardly be sufficient to deprive him of his right. He did, in fact, put in a claim about the same time and there are reasons why he might have wished to consider it a matter of private

14

concern and not one with which the public mind should be excited, perhaps, to his prejudice.

I now come to the claim of Maria Van Riper for a portion of the reward. She was a domestic in the family of Mr. Bangs and claims upon the ground of contributing, in the way of discovery and information, to Mrs. Bangs two particular facts, which confirmed her suspicions and led to a determination on her part to send her husband for the officers. The first circumstance is, that on Friday, when the boarder had his accomplice in the room, with the door locked, she called Mrs. Bangs' attention to the circumstance of the window shutters being partially closed; and the other that on Saturday, having discovered a small morocco trunk in his room, she mentioned the circumstance, and also, on perceiving the boarder going out with the same under his cloak, she told of it; that it was upon this, Mrs. Bangs immediately went to the room and finding the remaining trunks strapped, as if ready for removal, proceeded to take the measures already stated for their seizure. With respect to the first circumstance: the testimony fails entirely of proving she first discovered and gave information of the closing of the window shutters. Mrs. Bangs undoubtedly became aware of it, and it might have been from her own observation; and as to the latter the evidence is contradictory. One fact seems to be admitted, namely, that Maria Van Riper did mention to Mrs. Bangs sometime on Saturday of the boarder's having brought in a small morocco trunk which was then in the room; and if the witness Maria Smith be correct as to the conversation to which she testifies between Maria Van Riper and Mrs. Bangs, the inference is that the former did discover him going out with the small trunk and gave the latter information of it. This, too, is probable, from the circumstance of her serving him with tea in his room and thereby having an opportunity of observing his actions—added to the fact of his going out immediately after tea and about the time she naturally must have been engaged in removing the tea service. I am disposed to think it is true that Mrs. Bangs did derive her information from this servant of the robber's carrying out the small trunk and that upon this she was induced almost immediately to go up

stairs and reconnoitre the room and observe the remaining trunks. But there is nothing to show that this defendant gave the information with any intention, on her part, of inducing Mrs. Bangs to act upon it or of becoming a party, at all to the proceeding which might ensue. This I hold to be necessary, according to the principle which I have before laid down ; and here I think is the deficiency in this claimant's case. And so far from her acting in concert with Mrs. Bangs for the purpose of detecting the robber and discovering the stolen property with a view to the reward, the testimony of a number of witnesses shows she was incredulous on the subject and that the idea of benefitting herself, through the promised reward of the bank, could not have entered her mind. Her declarations and conduct, in several particulars, shew her to have been—like the boarders—a mere observer of the passing incidents of the week, with some curiosity excited in relation to the stranger, yet indifferent as to any result or as to any hope or expectation of sharing in the reward in case he proved to be the bank robber. Consequently, I cannot allow her now to participate.

The result of my opinion upon the whole case is that the exceptions taken to the master's report by the defendant Henry Bangs must be allowed ; and that those taken by the defendants Jacob Hays, Benjamin J. Hays and Zebulon Homan and by Maria Van Riper respectively be disallowed. The decree should be entered declaring the defendant Bangs entitled to the whole of the fund paid into Court by the complainants in the cause.

In expressing this opinion I do not mean to be understood as saying that the officers are not entitled to some compensation, besides what they may have received from the police department or the public for the time spent and the services performed at the request of Mr. Bangs in securing the money and arresting the felon. If they have any claim of this sort, as upon a *quantum meruit* (but about which it is not for me to express any opinion) it must be made against Mr. Bangs personally. But it gives them no title to the reward offered by the bank, nor any right specifically to the fund in Court.

With respect to the costs of this litigation : I think it is pro-

per, under the circumstances, for each party to bear his own costs. The master's bill upon the reference forms a large item of the expenses of the suit as between the defendants ; and each must pay such part of it as has been occasioned by the time occupied in the examination of witnesses and for drawing the depositions on their respective sides.

I apprehend it will not be difficult for the master to separate his bill accordingly.