Nott, J.,
delivered the opinion of the court:
This is an action brought to recover for army supplies sold at St. Louis in 1861, and the amount claimed is $163,111.
The story of the case is such as must admonish one — if the admonition can be needed — of the true value of those rules of human action which we term law, and it may also awaken in the mind of him who may peruse it a desire for the return of that deep reverence for both the forms and the authority of law, which, under the name of “law-abiding,” has been the characteristic trait of the American people. In a great civil war the government must reach its ends by speedy rather than certain means, and in the train of evils by which great civil wars must be accompanied are cases of human rights adjudged by other rules than those which are administered by courts of justice. How great the value of the law with all its tardiness, its uncertainties, and its defects; and how false and valueless are all other tests for measuring men’s rights, and how insecure would life añdliberty and property become were military discretion or governmental arbitrators to take the place of the slow measures of the law, the cases of which this completes the class may well illustrate.
In August and September, 1861, Major General Fremont, commandingthe “ Department of the West,” and Major McKinstry being his chief quartermaster, all of Missouri, save the great rivers and railways, being in the possession of the enemy, and her chief city threatened by both revolt and invasion, the merchants of St. Louis were as a class afraid -to trust their government. Among the exceptions was the house of Child, Pratt & Fox, which from the first stood with unwavering faith for the government, and which alone of the great commercial houses of St. Louis dared to hang out the American flag at the time when the decision of the ever-lamented Lyon saved the city by destroying the rebel force that, under the guise of a State guard, was drilling in her suburbs. This house determined to stand or fall with the government. Once the resident partner *183 seems to have hesitated, and to have appealed to his senior in New York for instructions. The answer came by telegraph, Sell the government to the last dollar; we ship you heavily to-day.” The house did so, and on the 10th October, 1861, it held a balance of unpaid quartermasters’ vouchers amounting to $478,119 62.
The history of the unfortunate administration of General Frémont has been sufficiently traced in the decisions of this court. When its downfall came, and public suspicion fastened upon everything connected with its financial management, the claimants, as among its largest contractors, were also among the most suspected. A detachment of the provost guard suddenly took possession of the claimants’ office, their safe was broken open, their papers scattered on the floor, their business books of account opened to the inspection of government accountants, and their unpaid vouchers against the defendants handed over to the “Dcms-JELolt-Qampbell commission.”
The records of this commission illustrate afresh the benefits conferred upon those few portions of mankind where life and liberty and property are guaranteed by that “ due process of law” which places the rights of the citizen above the power of the government. The commissioners could not have been more discreetly chosen. The first an eminent jurist, who for many years had been respected as a just and learned judge within his own State, and whose talents now adorn what, in constitutional power, is the highest judicial tribunal in the world. The second had been a faithful and distinguished member of the cabinet in the most dangerous hour of our national peril; and who has since administered the military justice of the United States as Judge Advocate General. The third was a merchant of St. Louis, eminent as a merchant, a friend of the government, and distinguished for culture, ability, and probity.
No three men could have been found in this country of varied experience, ripened judgment, high attainments, and lofty personal character, better fitted to administer exact and immediate justice untrammeledbythe tedious formalities and unyielding precedents of the law. Yet when these three gentlemen, whose whole lives had taught them the great lesson of respecting individual rights, left the beaten path of the law and essayed to do justice by other tests than those of legal experience, their decisions became of that character which we have been accustomed to *184 regard as dangerous to all civil rights when witnessing their action under despotic governments. This military commission teaches to American citizens the lesson that constitutional liberty consists not alone in a republican form of government, nor in legislative representation, nor in the frequent choice of a chief ruler, nor in all of these combined, but in that firm belief in the sacredness of law, which alone can assure mankind of security for life, or liberty, or property.
In this case the claimants’ private books, which merchants proverbially guard with jealous care, were thrown open to a stranger selected exclusively by the commission. This accountant was not subjected to cross-examination, nor were his investigations tested by the usual principles of the law of evidence. No counter testimony was allowed to be given by the claimants, nor were they heard in their own defence. On the report of the accountant, which was partial in regard to the extent of the transactions and imperfect in the manner of computing- and stating the claimants’ profits upon the goods sold, an arbitrary deduction was made from every account. Further deductions were also made “ as reclamations for other claims of said Child, Pratt & Fox, held by their assignees, and allowed in full.” The vouchers of the claimants were then mutilated by making these deductions in red ink upon their face. Finally, the vouchers were forcibly withheld from the claimants until they consented to sign a receipt not under seal and expressing no consideration, which provided that when these altered vouchers should be paid payment should be “ in full of all demands against the United States.” (See the Frémont Contract Cases, 2 C. Cls. R., 34.)
It is needless for this court to review its decisions upon this subject. These arbitrary and ex parte deductions made by the commission, standing by themselves, cannot be upheld by any principle of law or justice with which we are acquainted. We have admitted in evidence the proceedings of the commission and the receipts or releases of the claimants, and have endeavored to give to them all the weight which has been claimed for them. But we find them worthless in law: the former, because Congress alone have power to submit the rights of the United States to arbitration, and consent and mutuality are essential elements of arbitrament; the second, because they were without consideration, and exacted by the duress of the claimants’ vouchers. Yet it has been urged with great earnestness by the *185 Assistant Attorney General that tbe Joint Resolution 11th March, 1863, (12 Stat. L., 615,) and tbe subsequent acceptance of tbe amount awarded and receipts of tbe claimants, ratify and render legal tbe acts of tbe commission. This joint resolution provides “that all sums allowed to be due from tbe United States to individuals, companies, or corporations, by tbe commission heretofore appointed by tbe Secretary of War for tbe investigation of military claims against tbe Department of tbe West, * * * now sitting at St. Louis, Missouri, shall be deemed to be due and payable, and shall be paid by tbe disbursing officer either at St. Louis or Washington, in each case upon tbe presentation of tbe voucher with tbe commissioners’ certificate thereon in any form, plainly indicating tbe allowance of tbe claim and to what amount.” At tbe time this resolution passed, tbe disbursing officers, knowing no law for making such reductions upon vouchers given by tbe proper officers of tbe government and in due form, bad refused to pay tbe awards of tbe commission. Tbe joint resolution declares that tbe "sums allowed,” shall he deemed to he due,” and directs tbe disbursing officers to pay them. This is all that tbe joint resolution does. It in no manner provides that tbe acts of tbe commission shall be deemed legal like tbe acts and resolutions ratifying tbe various proclamations of tbe President, nor in any way repudiates tbe legal liabilities of tbe United States for tbe balances left unpaid. It would be difficult to draught an act which would provide for tbe payment of tbe amounts found to be due by tbe commission and leave all other questions more completely untouched and undisturbed.
But apart from any legalizing effect of the joint resolution, tbe fact remains that tbe claimants did present their mutilated vouchers for payment, and did voluntarily signa second series of receipts whereby they acknorvledged having received tbe reduced amounts “ in full of tbe above account.”
Of these receipts two things may be said: In tbe first place, tbe acts of tbe commission bad taken from tbe claimants their business books of account, bad suspended their business transactions j bad reduced them to tbe verge of bankruptcy, and bad been constantly met by tbe claimants’ repeated and most earnest protests. At tbe same time they bad no legal redress; for this court, as reconstituted by tbe Act 3d March, 1863, (12 Stat. L., p. 765) did not then exist. Tbe law does not require needless *186 acts, and a fresh, protest in March — after ail their repeated protestations during the preceding three months, and after the orders of the War Department prohibiting the payment of their accounts — would have been auseless formality. The defendants did not proffer the payment as a compromise; the claimants did not profess to receive it as such; and it appeared on the face of the papers that the less sum received for the greater was an exaction of the defendants’ agents, and no act of the claimants.
In the second place, before these receipts were given and after the reductions had been made by the commission, it appears that the accounts were in the office of the Quartermaster General, and that each bears this indorsement:
“Referred to Major M. S. Miller, quartermaster, for payment, under the joint resolution of Congress approved March 11,1862.
“M. C. MEIGS,
“ Quartermaster General.
“March 19, 1862.”
The payment therefore-professed to be nothing- more than a payment under the joint resolution, and that resolution, as we have seen, provided only for the payment of the part found to be due by the commissioner. Major Miller therefore could not have paid the remaining part, and the receipt given therefor under those circumstances was clearly without consideration and wholly void.
There is one more point of law to be considered before we reach the merits of the case. These purchases were not made by advertising previously for proposals as required by the Act March 2, 1861, (12 Stat. L., 220, § 10.) That act provides that when an immediate delivery “is required by the public exigency, the articles or service may be procured by open purchase or contract at the places and in the manner in which such articles are usually bought and sold or such services engaged between individuals.” At the time of these purchases this court has found that there was a “public exigency” existing of the gravest and most urgent character, and the government and every officer of the government had so declared. The question therefore is, whether the articles were procured by open purchase in the places and in the manner in which such articles are usually bought and sold between individuals? By this we presume is *187 meant articles bought and sold under lilce circumstances. That is. to say, the statute requires of a quartermaster buying supplies in such an exigency tliat openness, diligence, prudence, and care which an individual might be supposed to give were he buying goods in just such an exigency aud amid just such circumstances.
The circumstances amid which these purchases were made are thus detailed by the chief quartermaster of the department:
“ Yolunteer troops commenced to arrive here from the whole of the northwest, without any intimation to me of their expected arrival, and the instant they landed on the levees of the city my office was besieged by colonels of regiments and regimental quartermasters demanding, on the instant, such supplies as were necessary to enable them to go into camp — for instance, tents, camp-kettles, axes, spades, and so on — what was termed camp equipage in the Army Regulations. Their requisitions would be accompanied by an order from General Frémont to furnish instantly the articles required, the troops meanwhile standing formed, in the sun, in the street.
“ The department had no supplies on hand. I made effort at General Frémont’s adjutant general’s office to ascertain how many troops he expected, where they were to come from, and when they would arrive, with a view of sending a requisition to Washington city, knowing that the articles called for were not in the west. General Frémont and none of his staff could give me the information required — each governor of a State acting independently of him, raising troops and forwarding them here without notice to him. From the best information I could obtain in that way I estimated for about 90,000 men, and made requisitions upon the head of my department in Washington city in accordance with such estimate, both by letter and telegraph, stating that the articles that would be required were not to be had in the west, and suggesting that the clothing department in Philadelphia be ordered at once to provide these articles. I was informed in reply that the department could not meet the requisitions that were being made by the army of the Potomac; that the preservation of the capital was deemed of more importance than the State of Missouri; that their entire time and attention was devoted to meeting requisitions made upon them; that they couldn’t do .it; that General Frémont had full power, and that I, as his chief of the quartermasters’ de *188 partment, must use my own judgment and do tbe best I could towards meeting the wants of the troops.
“ The department here was without supplies of any kind, and without a dollar in money. A large portion of the State of Missouri was in the possession of the rebels, the city of St. Louis virtually so. By way of illustration of the exigencies of the service: As late as 5 or 6 o’clock in 'the evening steamboats would arrive here with thousands of volunteer troops. They would be landed on the levee, and in most instances marched up in the neighborhood of my office, and the necessary supplies to put these men into camp, give them a supper, and a blanket to sleep on, would be immediately demanded of me. I had as many as a dozen gentlemen in my employ, whom I would instantly start in every direction in this city to hunt these supplies, my purchases not at all being confined to the house of Child, Pratt & Fox. The first thing they had to do* on their landing on the levee at this city, and before they could move from there, was to call on General Fremont and myself for these supplies. That was their first duty, and, as a consequence, their requisitions were in within an hour after their arrival. Most of these troops — the troops from other States — arrived by steamer, without any previous intimation of their arrival to me or to anybody, and the first notice that General Frémont or myself would have, in most cases, of their arrival, would be the appearance of the colonel and regimental quartermaster of the regiment; and their first business was to make known their wants for tents, clothing, cooking utensils, and all that sort of thing. They would make out a requisition — the regimental quartermaster would — signed by the colonel or commanding officer of the regiment. To that requisition would be appended General Frémont’s order on myself to furnish without delay. I would be compelled to answer that I did not have the articles; and I invariably took the colonel to task for not notifying the department here of their intended arrival, in order that I might have time to provide for their wants; and I endeavored, by talking with General Frémont and his staff, to impress on them the importance of making known to the governors of the respective States the necessity of their posting this department of their intention to send troops here.
“Before these troops could move from the levee or from the front of my office to camp they were compelled to have the ar- *189 tides called for, and I would be ordered by General Frémont to purchase or get them in any shape, form, or manner — in the best manner I could.
“ The first thing required was covering, in the shape of tents; transportation, in the shape of mules and wagons to carry them to camp; camp-kettles, mess-pans, for cooking purposes; axes, spades, shovels, for camp purposes; and clothing,shoes, stockings, drawers, shirts, pants, coats, and blankets.
' “ To show that exigency, I will state that on the 29th of July, 1861,1 was ordered to have at command, during the next fortnight, clothing, camp and garrison equipage, for 23 regiments of infantry, three regiments of cavalry, and one regiment of artillery — about 28,000 men. On the same day I was directed to purchase 500 sets cavalry equipments for to-morrow, (August 20.) I was ordered to purchase in this city, August 20, and have ready to forward at once, clothing for 6,000 men; August 21, to purchase 1,000 pairs pants and the same number of jackets; September 4th, to contract for not less than 1,000 wagons and mules required for these 6,000, with the least possible delay.”
The manner in which the chief quartermaster procured the supplies was this: After applying to the Quartermaster General at ‘Washington, and being informed that all supplies there were needed for the defense of the capital, and that he must procure them as best he could, he thus proceeded:
“Whenever a requisition was made on me, a copy of that requisition was pasted on a bulletin-board that I had on the outside of my office, (my office always being surrounded by hundreds,) making known that I wanted immediately such and such articles — that being the nearest approach, under the circumstances, that I could make to the requirements of the law. That bulletin-board, together with the efforts of these messengers of mine sent out to hunt up supplies in the city, was the only means of advertising that I had.
“ The vouchers pending before this court, to which my name is affixed, were all critically examined by me. I was satisfied that the house of Child, Pratt & Fox, according to these vouchers, were charging but a reasonable profit, and I know and swear that there was no collusion between us.”
The question was asked him “What, if. any, inquiries did you make to ascertain whether army supplies, such as were needed *190 in tbis department, could be obtained at tbat time in adjacent cities or States this side of the Alleghany mountains ?
“Answer. I made inquiry by letter, by telegram, by sending agents and officers of the department under me to Cincinnati, to Cleveland, Detroit, Chicago, and even Peoria, Illinois, and all other villages where I had reason to suppose one bale of blankets or one package of shoes could be obtained.
“Question. After making all the inquiries you have stated, state whether or not you gained any information that enabled you to procure the necessary and needed articles either quicker or cheaper than you did procure them from Child, Pratt & Fox.
“Answer. I sent agents to Montreal and Quebec; I bought everywhere and anywhere I could; I had the Canadas searched for blankets. I reported to the chief of the department in Washington city the wants of this department and the extremity of this department, and I used every exertion by telegraph, by letter, by agents, and by the exercise of the military power conferred on me as provost marshal, to obtain army equipments, and I failed in almost every instance outside of this city, because the ground was covered by other quartermasters, including the Quartermaster General from Washington, and I had remonstrances addressed to me by the quartermasters of Cin-cinnatti and Chicago that if there were any supplies there they wanted them themselves and that I ought not £o trench on their ground. I did not get supplies from all the places I have mentioned, but in limited quantities, and at higher rates than I paid Child, Pratt & Fox.”
But as the wants of the department increased and the supplies in St. Louis diminished, the chief quartermaster was compelled to resort to still different means, which are thus described in his testimony:
“ Question. Before or at the time that you ordered or purchased clothing, hardware, boots, and equipage of any kind of Child, Pratt & Fox, did you make, or cause to be made, an examination or inquiry throughout the city of St. Louis as to the character and quantity of army equipage that you could obtain in the St. Louis market.
“Answer. I did. I made it in person and through my agents. I believe it to have been a thorough canvass of the whole city.
*191 “Question. In tbe purchase of these articles aucl equipage which are in. controversy in this claim, state whether there was any inspection or examination of the goods that were purchased by Child, Pratt & Fox, before the vouchers in question were made and delivered to them.
“Answer. I have no particular recollection of these particular vouchers, but in all cases, after the thorough canvass of the city spoken of in my previous answer, and finding that the materials required were not in the city, and after I had endeavored to obtain from headquarters the probable number of troops that would be concentrated here, I submitted to General Frémont, in writing, a memorandum of what 1 deemed necessary to be done. I have a correct copy of that memorandum before me. It is as follows:
111 Memorandum for Major General Fremont, by J. MoKinstry, A. Q. M.
“‘The chief quartermaster, after careful consideration of the probable wants of the army now being organized under your command, would respectfully recommend that he be ordered to enter into engagements for the immediate supply of the following articles on the following terms, to wit: The parties receiving the orders to repair at once to New York, and after consultation at the office of the quartermaster in charge of the clothing depot in that city, and receiving from him samples of the articles required, to agree to furnish a sworn list of the prices at which the several articles will be furnished, giving in detail the cost of materials and workmanship, the same in no case to exceed the ruling market prices, together with a fair market profit to the contractors.’”
General Frémont approved this plan, and the chief quartermaster then made this agreement with Mr. Fox, one of the claimants’ house:
“I stated to him that I had authority as provost marshal to seize whatever supplies I required, but I was satisfied that it would not work, as I stated before; it would prevent supplies coming into the city the minute I attempted it. I told him I should require him to furnish me whatever goods he had, and all he could get; that I would exercise a rigid scrutiny of his accounts; that under these emergencies I would allow him a fair mercantile profit, and the business before this court now *192 commenced. With that understanding, tlie business included in this account now in suit, as I perceive by the petition in this case now before me, began.
“Mr. Fox told me that their business was that of hardware; that if an attempt was to be made by him to furnish anything else, he must consult partners resident in New York. The result of that conversation, as I was informed, was an agreement to establish his army supply business.
“I examined his invoices, I made an estimate of the cost of his doing business, aided by my cashier, and the vouchers that I signed and gave him for goods were based upon that accurate examination, and my firm conviction then was, as it is now, that he charged only a reasonable profit.
“I believe this to have been the commencement of Child, Pratt & Fox’s dealing in army supplies other than those of their regular business.
“ Child, Pratt & Fox furnished me with many of the articles covered by these vouchers in question. I followed out the rule laid down in the above memorandum. I saw in many instances the original invoices, the extraordinary charges for express freights, and the various expenditures required in furnishing at so short notice the clothing and articles required. I had my cashier critically examine them, I had my chief cleric do the same, and thenl examined their examination and I affixed what I deemed a fair mercantile imofit, and gave the house of Child, Pratt & Fox a voucher covering that amount. I will state also that I had no standing order with Child, Pratt &Fox; I bought of them as the exigency of the service required; and that if I could have done so, I would have entered into contracts for the purchase of what the army would require, and in the prices to the articles in these accounts; and I repeat that every voucher to which my name was affixed was carefully and closely scrutinized, with all the facts and circumstances attending the purchases before me, in many instances I having the original invoices of purchases abroad; and that I allowed the fair, usual, and customary mercantile profit, and no more, with the full conviction, on my part, that many months must elapse before the government could pay that money.”
These being the facts, we think that the chief quartermaster acted much as an energetic business man would have acted in his own business if acting without money, with shaken credit, *193 under a pressing exigency, and in a place where but a part of his needs could be supplied. Publicity and competition were the leading objects of the statute. Reviewing his proceedings now, we do not perceive in what way the chief quartermaster could have made the purchases in a more open manner or could have secured to the government a nearer approach to direct competition. If he did all he could under the circumstances to attain these two ends, then the conditions of the statute are fulfilled: for the statute intended that in a proper exigency supplies for the army should be procured, and that they should be procured bylawful means; and it was never intended to be construed as declaring contracts illegal which as nearly as possible comply with its requirements. A statute relating to national exigencies must needs be liberally construed.
But this case can form no precedent for other cases; for the great and awful exigency which threatened to destroy the national life cannot, we trust, ever be repeated.' What was right and lawful for a quartermaster to do under such circumstances can be right and lawful only when the circumstances are repeated. Thus believing, we hold that the form of the purchases in this case are not necessarily illegal, and that their legality depends upon their bonafides. ■
The transactions of Chil<f, Pratt & Fox come into this court clouded with apublic suspicion whichmay wellexactthe severest judicial scrutiny. Moreover, the chief quartermaster by whom the purchases were made has since been dishonorably dismissed the service of the United States for frauds found to have been practiced by him upon his government. The case, therefore, has been examined with more than usual deliberation. After one trial it was sent back to the docket in order that it might be heard before a full bench. The delay has also given to the defendants the benefit of fresh legal ability, and enabled them to reprobe the evidence with all the ability of the Attorney General and his learned assistant.
The first fact which the evidence discloses is that these goods were sold in the darkest hour of the rebellion, and in a city whose fate was, of all the cities in the land, the most uncertain. The goods, moreover, were bought by the claimants for gold, and sold to the government for irredeemable quartermasters’ vouchers. Some previous vouchers, too, had been paid in half-worthless paper money, borrowed of the St. Louis banks; but *194 those to follow, including those in suit, had not even that assurance, and were to be held as .uncertain ' evidences of debt until the government should be able and willing to redeem them. The government’s gold-bearing bonds had fallen more than 15 per cent., and its paper money had not yet been issued. The value of the vouchers, therefore, in gold could only be estimated by finding the depreciation of government bonds, gold-bearing, and clothed with all the evidences of national faith that could be bestowed upon such securities, and then estimating a further deduction for these vouchers bearing no interest, redeemable in such money as the government might in future choose, issued by a solitary quartermaster under no special authority of Congress, and perhaps unauthorized by law. It is, therefore, not surprising that merchant after merchant from St. Louis has testified that at that time the government was without credit in St; Louis, and that they were unwilling to sell to the quartermaster of the United States. It is also not surprising to find that many of these merchants were willing to sell their goods to the claimants, and unwilling to sell to the government; for, as Mr. Durkee, a banker of St. Louis at the time, put it: “I was asked, did I consider it safer to sell to Child, Pratt & Fox than the government. I gave in my opinion that it was, because they would have the government to sustain Child, Pratt & Fox, and would have those men’s private fortunes besides, for I believed they would pay the last dollar they had in the world. I felt it was better to sell them than the government, and so advised them. In other words, I thought they would get double security, just as much better as all their private fortunes were worth.”
A large portion of the goods were also hurried forward from the east under the most urgent order of the chief quartermaster, by express, and came, consequently, charged with the extra expense of what is termed “fast freight.” Finally, the claimants were obliged to re-pack their goods, and also to deliver them at the various camps contained in a circuit of several miles around St. Louis.
These extraordinary items of expense were not taken into account by the accountant who estimated the claimants’ profits for the commission. Looking simply at the price paid in gold and the price received on vouchers, he may well have been *195 deceived inte believing the difference to have been exorbitant profits.
There is yet another item to be taken into account before condemning the claimants’ sales as fraudulent, and that is that they were sales made on a 11 rising market.” We all know the great advance in price which occurred during the first year of the war; and when a merchant-with no excess of stock on hand sold in the full view of such advances on an uncertain credit, and without interest, it is not unreasonable that he should charge liberally for his goods. Before this court was-clothed with its present powers the government bought on credit under two great disadvantages, one of which still exists: first, that it could not be held to the legal accountability of a private debtor; second, that it paid no interest.
When we examine the prices charged and profits made on the various items of goods sold to the defendants and making up the aggregate amount of $478,119, for which the claimants held vouchers, it is evident that no scale or settled rule existed. In some instances the claimants bought in St. Louis and resold to the government at precisely the same price they paid, making no profits whatever, and, indeed, suffering a loss; in others, a large advance is charged. These items are taken from the report of the accountant who made the estimate upon which the commission acted. The highest item of profit in this report will show the partial character of the statement. It is as follows :
“ Sold, from September 1 to October 1, 411 frying pans, at 50 cents each. September 21, an invoice of 57 dozen, cost in Pitts-burg 17i cents each. Profit, 1S8J per cent, on Pittsburg cost.”
It is thus apparent that the alleged profit of 188J per cent, on 411 frying pans, delivered at various encampments around St. Louis, on the 1st October, is based on what 57 dozen cost in Pittsburg on the 21st September, no allowance being made for the cash and credit nature of the two transactions; for the expenses of telegraphing and expressage, of cartage and storage, of re-packing and re-delivery; norforthe fact that the goods were bought with gold and sold for depreciated quartermasters’ vouchers.
The only other item where the difference of cost and price exceeds 100 per cent, is that of $836 30 for 3,374 curry-combs. Here the "cost east” was 11 cents, and the price charged 23f *196 ents; but tlie time of purchase and sale ranges from tlie 15th August to the 8th October, and'there is no telling how much the articles might have advanced in the eastern market during that period.
It is hardly to be expected, where goods were bought and sold in the haste and excitement which attended these transactions, that the ordinary, scrupuldhs care and nicety of mercantile transactions would be preserved in fixing the exact percentage of profit on each article as it was sold; and where parties thus dealt by what was virtually a running account, the only just and proper way of estimating the profits is to ascertain the percentage on the entire mass of property sold. This has been done by the witness, Mr. Goghlan, an experienced bookkeeper, and his analysis of the table used by the commission shows that the price paid for the goods was $226,520 11, the price charged and for which vouchers were given $322,-761 22, being1 a difference of 42 per cent. Out of this difference the claimants had to pay all their expenses, and to cover their losses for interest and for payment in depreciated paper. There is, therefore, not only none of that great exorbitancy of price which, as we held in Bearffls Case, (3 0. 01s. R., 122,) implies imposition or collusion, but, on the contrary, the profits of these vendors, regard being paid to the peculiar circumstances of their sales, seem not unreasonable.
Finally, the evidence of the defendants to show fraud or collusion (apart from the statement of the accountant so often referred to) is of the most trivial character. One business house in St. Louis shows that they made an effort to sell shoes to the government which they afterward sold to Child, Pratt & Fox, and would have sold them at the same price; but the evidence is suspicious and evasive, and does not show that they offered them to the chief quartermaster at the same price. Another merchant testifies at what rate he sold to Ghild, Pratt & Fox, but does not state that he would have sold to the government at the same price, nor that he offered to sell at any price. A third house shows that they sold camp-kettles and mess-pans to the claimants, who instantly resold them to the government at a large advance. They also state that they offered to furnish these to the government at the same rate as to the claimants, but that their offer was refused by the chief quartermaster. This is the strongest direct evidence in the *197 case for tbe defendants; yet against it it appears, first, that no more mess-pans and camp-kettles were purchased of the claimants after this offer was made; second, that the chief quartermaster refused to consider the offer because he had once detected the parties in an attempt to perpetrate a fraud. In this explanation of the chief quartermaster we do not put much faith except to show that a quarrel existed between him and the house, and thereby the spirit in which the testimony was given.
Upon the whole case, therefore, we are satisfied that there is no just ground for the suspicions which have so long prevented the claimants from receiving the agreed price of the goods they sold. More than seven years have elapsed since the last account was settled and liquidated by the parties, and more than $70,000 would be recovered for interest if the suit were against an ordinary defendant; but the law does not allow of such damages being awarded against the government, and the relief to be given is limited to the balance remaining due.
The judgment of the court is, that the claimants recover $163,111.
LokiNG-, J.:
The evidence does not satisfy me that the purchases were made in open market.
Peck, J., did not sit in the case.