## Case No. 17,332.

### In re WEBSTER et al.

[9 Int. Rev. Rec. 137.]

Circuit Court, S. D. New York. 1869.

CUSTOMS FRAUDS—COMPROMISE OF CRIMINAL PROSECUTION—AUTHORITY OF SECRETARY OF TREASURY—RIGHTS OF INFORMERS—JUDGMENT IN FRIENDLY SUIT—CONCLUSIVENESS.

1. Frauds upon the customs revenue were discovered, and criminal proceedings instituted against the offenders, and action commenced to recover the duties estimated to be due. Upon negotiation, the secretary of the treasury, acting under section 10 of the act of March 3, 1863 [12 Stat. 740], authorized a compromise,—that all said civil and criminal proceedings should be discontinued, and the offenders should pay to the United States $59,-722 in gold, on account of said duties, and $32,-000 in currency, on account of penalties incurred, and thereupon be relieved from all liabilities. All said proceedings were accordingly stopped, and the sums mentioned paid into the registry of the court, but only after confession of judgment in a friendly action of debt for the several amounts as penalties, instituted by the district attorney. The United States claimed the entire gold fund as duties. The customs officers claimed one-fourth as their legal share of the fund as penalties, and two sets of informers claimed shares of the fund as penalties, against the United States, and as between each other. Held, that the compromise was without legal or binding effect, and invalid, in not having been made in accordance with the said section, and the secretary of the treasury had no power, under any law, to compromise criminal proceedings in such a case. Notwithstanding the invalidity of the compromise, the entire gold fund adjudged upon the admission of the offenders in the negotiations which led to it, and upon other uncontradicted evidence, to belong wholly to the government as duties.

2. The record in the said friendly action of debt was not conclusive evidence of the rights of the parties and the character of the fund.

3. As between two sets of informers, where the first information of the frauds, which led to the eventual recovery of the penalties, was given by one set, and the other rendered valuable service in collecting evidence and testimony, and expended money therefor, without which it was doubtful whether any considerable sum would have been realised. held, that the first set, that gave the information which induced the prosecution, was entitled to the informer's share.

At law.

Simon Towle, for the United States.

C. A. Seward, for Webster, Moulton & Beecher.

C. Fine, for Burtnett & Heffelin.

A. W. Tenney, for Wiggins.

BENEDICT, District Judge. This is a controversy between the customs officers and certain informers on the one hand, and the United States on the other; and also between the informers, among themselves in regard to the distribution of a certain fund which originally consisted of $59,722 in gold and $32,000 in currency, and which was paid into the registry of this court, under the following circumstances: In the summer of 1867 the officers of the customs having discovered that great frauds upon the government had been

perpetrated by persons doing business in this city under the name of J. W. George & Co., by means of the unlawful withdrawal, without payment of duties, of dutiable merchandise from the bonded warehouse Nos. 290 and 291 West-street, criminal proceedings were instituted against the offenders, in which several of them were arrested and held to bail for trial, and a civil action for duties, amounting to $400,000, was commenced in the district court against one of them, named Henry Hart, in which suit a large amount of real estate and personal property was attached; a quantity of cigars, appraised at some $25,000, was also seized by the collector, as forfeited by reason of these frauds. Pressed by these proceedings, the offenders commenced negotiations with the officers of the government, which terminated in an agreement made at Washington with the secretary of the treasury, by which it was arranged that the offenders should pay to the United States the sum of $59,722 in gold for the duties on the cigars, brandy, rum, gin and wine withdrawn by them without payment of the duty, and also $32,000 in currency as penalties for illegal abstraction of such bonded merchandise; and upon such payment the government was to discharge all the property which had been attached or seized, and release the offenders from all civil and criminal liabilities relating to the illegal transactions. Accordingly, instructions were issued to the district-attorney to carry into effect the arrangement, and the offenders proceeded to make the payment agreed on. This payment, however, by arrangement with the district-attorney, was not made in the action for duties which was pending in the district court, but a new, and in some sense a friendly, action of debt was commenced in the circuit court, not for duties, but for penalties and forfeitures, amounting to the sum agreed on, namely, $59,722 in gold, and $32,000 in currency, in which action judgment was confessed on the same day, and the same satisfied on the payment, into the registry of the circuit court, of the sums demanded. At the same time the property attached in the action pending in the district court was released from custody, and all the criminal proceedings stopped. The cigars held under seizure by the collector were also directed to be released on due entry, and payment of the duties to the collector. There being thus $59.722 in gold, and $32,000 in currency, in the registry of the court, a controversy arose respecting the rights of the customs officers and the informers in the fund, it being claimed by the officers and informers that no part of it was duties, but that it was all penalties and forfeitures, and as such was distributable one-half to the government, one-fourth to the customs officers, and one-fourth to the informers. A controversy also arose between the parties claiming to be the informers, in regard to their respective rights. One-half of the gold and one-half of the currency, being clearly payable to the United States, has been so paid by consent, and one-half the residue of

the currency admitted to be payable to the collector has also been paid by consent, thus leaving in the registry $29,861 in gold and $8,000 in currency. To one-half of this $29,861 in gold the customs officers lay claim. The informers claim the other half, as well as the balance of the currency. These respective claims have been set forth by petitions, under which, by order of court, testimony in behalf of all parties has been taken by the clerk, upon which petitions, and some 363 pages of testimony, with a mass of exhibits, the case now comes before the court for its determination.

The course of procedure adopted in this proceeding appears to me somewhat irregular. A more proper practice would have been for the customs officers and informers to have set forth their claims to this fund by petitions to which answers should have been interposed by the government, and upon the issues thus framed and the testimony adduced by the respective parties in support of their allegations a decree could have been rendered with less danger of confusion and mistake. The respective parties petitioning here seem to have treated each petition as an answer to the others, and the custom-house officers appear to have considered themselves entitled to prove their case under the petition presented by the United States. But as all parties have spread out their case very fully on the evidence, and as all the points in controversy have been considered and argued by the counsel without objection, as if duly pleaded, it appears unnecessary to direct the proceedings to be reformed.

In considering the questions thus raised it will be convenient to examine first the claim made by the customs officers and informers to that portion of the fund consisting of $29,861 in gold. The claim in regard to this is $59,722 in gold, of which the $29,861 remaining in the registry is a moiety, consisted of fines and penalties, and that a moiety of it is given by law to the customs officers and informers, while on the part of the United States it is contended that the $59,722 was not fines and penalties, but duties, in which no person is entitled to share with the government. The determination of this issue renders it necessary to consider at the outset the effect of the record of the judgment in favor of the United States against the offenders which was entered on the 27th day of December, 1867, and was satisfied upon the payment of this fund into the registry. This record, which it has been suggested on this argument must be conclusive in favor of the customs officers and informers, would, as I view it, if held conclusive, deprive those persons of any right to any portion of the fund. This will appear from an examination of the record itself. The cause of action which the record sets forth, and which was admitted by the confession is this: That certain parties, defendants, unlawfully removed from a bonded warehouse dutiable goods without payment of the duties, whereby, as it is averred, the value of the goods became for-

feited to the United States, wherefore the United States became entitled to have of the defendants $59,722 in gold and $32,000 in currency. The record nowhere refers to any statute by virtue of which the alleged forfeiture arose, and no statute has been found which forfeits the value of the goods for any such act as is set forth in the declaration, or which, upon the facts stated in the declaration, created a legal liability on the part of the defendants to pay to the United States this $59,722 in gold, and $32,000 in currency. Now, customs officers and informers can only claim to share in fines, penalties and forfeitures which are created by some law of the United States. If no statute exists by virtue of which any particular sum of money, whether called a fine, penalty or forfeiture, has been demanded and paid, no customs officer or informer can share in the money. Here was no forfeiture of goods, for no goods subject to forfeiture were proceeded against; the cigars which were seized by the collector were released, without any other condition than that they be duly entered, the duties paid, and the illegal acts charged in the declaration did not render the parties liable in a civil action under any law of the United States, to such fines and penalties as were demanded. It may be that the $32,000 in currency, which formed part of the demand, can be held to be thirty-two fines of $1,000 each incurred by virtue of the act of Aug. 6, 1846, and that portion of the fund has been so treated by the government; but this would not affect the $59,722 in gold which is now under consideration. If, then, the record alone were to be looked to as fixing the rights of the parties it would seem to confer no rights upon the customs officers and informers to a distributive share of the gold in the registry. This difficulty has been realized on this proceeding, and accordingly the customs officers and informers have not rested their claims upon the record of the judgment alone, but have without objection on the part of the government introduced much testimony to show the real nature of the claims made by the government against the offenders.

The case being thus opened, evidence has been also introduced by the United States tending to show the circumstances under which this money was demanded and paid. This evidence, therefore, thus introduced by the respective petitioners, and which discloses the actual liability which the parties who paid this money were under to the United States, and from which they sought to be discharged by the payment which they made must be considered in connection with the record in determining the character of the fund in question and the rights of the parties to share therein. It is proper to say here, that if the course of this proceeding had been otherwise, and the judgment entered on the 27th of December, 1867, had been relied upon as decisive of the character of this fund, it would doubtless have been incumbent upon the court—called on as this court is by this proceeding, to distribute a fund in its registry—to require a fuller explanation than has yet been given of the circumstances under which that judgment was taken. Upon this argument it has been treated by the counsel for the government as an inadvertence, and perhaps properly so treated, but it is such an inadvertence as to require full explanation before I should feel justified in disposing of this large amount of money in accordance with its terms.

Looking, then, into the evidence as it has been given, it appears that certain parties, doing business under the name of J. W. George & Co., perpetrated frauds upon the government by removing for consumption dutiable goods from a bonded warehouse without payment of the duties, that criminal proceedings were commenced against them, and, also, a civil proceeding, to recover some $400,000 of duties, in which suit a large amount of property was attached, whereupon the offenders applied to the secretary of the treasury for relief, and then plainly and deliberately admitted themselves to be liable to the government for duties amounting to $59,722 in gold, which they promised to pay, together with the sum of $32,000, as thirty-two penalties for as many unlawful withdrawals, which they also admitted to have been committed by them, and thereupon the secretary agreed that all the parties implicated should be released from all civil and criminal liability relating to the transactions in which they had been engaged, upon the payment of such duties and penalties. In pursuance of this agreement the parties did pay into the registry of this court the $59,722 in gold, and the $32,000 in currency in question, and all the pending civil and criminal proceedings were thereupon stopped by the district-attorney; but the payment, instead of being made in the proceedings pending at the time of the agreement with the secretary, was made in satisfaction of a judgment confessed by them in a friendly action which they suggested should be commenced as affording them a more satisfactory evidence of the payment of the money which they had agreed with the secretary to pay. Upon this evidence it has been claimed by the government that the agreement made by the secretary was a compromise made by virtue of the act of March 3, 1863, § 10 (12 Stat. 740), and therefore decisive of the character of the fund realized in pursuance of it; but to this I do not assent. The authority conferred by the act referred to is an extraordinary power which the interest of the secretary of the treasury, as well as that of the government, require to be carefully guarded against abuse. The statute therefore confines the power to the compromise of claims in favor of the United States, and confers no power at all in regard to criminal prosecution. It looks also to the attorney of the government in charge of the claim as the proper place of origin for arrangements looking to a compromise, and might well be held to confer no power in regard to claims not in suit, and it requires as the basis, and the only legal basis of action on the part

of the secretary, a report of the attorney of the government showing in detail the condition of the claim and the terms of compromise proposed, and also showing the approval of the terms by the attorney. It also requires in addition that the solicitor of the treasury should recommend the acceptance of these terms. Thus it will be seen that the act provides for the creation and preservation of a complete record of all cases of compromises, showing the transaction in detail, and the voluntary assent of three different officials to the terms of compromise which it is proposed to accept is required to make it effective. Under the statute the action of the secretary is confined to the acceptance or rejection of the terms recommended by the attorney. Here the terms agreed to by the secretary were never reported or recommended by the district-attorney, and the action of the secretary must therefore be held to be without sanction of law and of no effect as a legal compromise.

The present case, in which it has been claimed by the government that the recommendation of the district attorney of terms requiring a less sum than that finally agreed on by the secretary warranted the secretary under the statute in accepting terms deemed more favorable, affords a good illustration of the result of any other than a strict adherence to the provisions of the act. For it seems, as I understand the figures, that the terms agreed upon by the secretary, although apparently less favorable to the offenders than those recommended by the district-attorney, were, in fact, more favorable, and the sum realized was several thousands of dollars less than the parties themselves had offered to the district-attorney. While considering the action of the secretary in making this compromise, I feel bound to notice another prominent feature in it, which is, that the secretary undertook to compromise the criminal proceedings which were pending in court. Neither the act of March 3, 1863, nor any other act that I know of, confers that power upon the secretary of the treasury. The solicitor of the treasury may perhaps have power in a proper case, and upon his own official responsibility, to instruct a district-attorney to effect a discontinuance of a criminal prosecution for offences arising under the revenue laws; but I know of no statute which permits either the secretary or the solicitor to demand money of a person accused of crime in consideration of causing a criminal prosecution to cease, notwithstanding the fact that the money may be demanded for the United States, as was the case here. Civil suits for penalties and forfeitures may be compromised or remitted by the secretary in the manner prescribed by law, but I apprehend that neither the power to determine the extent of punishment to be inflicted in a criminal proceeding, nor the pardoning power has been intrusted to the secretary or the solicitor or the collector. The action of the secretary in regard to the criminal proceedings pending against J. W. George, Henry Hart and others, was therefore, of no legal or binding ef-

fect whatever, and his action in regard to the civil suits against the same parties was also unauthorized for want of compliance with the conditions which the statute imposes upon his power of remission and of compromise.

But while the agreement made by the secretary has no effect as a legal compromise to determine the character of the fund in question, the admission of the parties made to the secretary during the negotiation which ended in the agreement are competent and very controlling evidence to show the liabilities of the parties to the government and the real character of the fund which they subsequently paid in discharge of their liabilities. These admissions, with other uncontradicted evidence in the case, show that the parties who paid this $59,722 in gold were legally liable to the government for duties upon cigars and liquors amounting to that sum. This cannot be disputed as to $34,834.50 of the amount, for Henry Hart was the importer of cigars on which the duties had been duly ascertained and assessed at that sum, and which he withdrew without payment of any duty. As to the remainder, being duties charged on rum, gin, brandy and wine, although the custom-house officials seem to have difficulty in tracing the articles, the secretary had thirty-two orders on the bonded warehouse for certain specified withdrawals of such liquors, which were signed by these same parties, which quantity, it is proved, they withdrew without payment of the duties. The appraisers and other officers of the custom-house declare that neither the records of the custom-house nor the orders, nor both together, enable any one to say what amount of duties have been lost, but there is evidence tending to show withdrawals of liquors by these parties from this warehouse without payment of the duties. And this evidence with the admissions of the parties as to the amount, is sufficient to show that this is not a case of simply calling a sum duties which was in reality penalties, as has been contended, but that an actual legal liability to the government for duties existed, the exact amount of which the parties admitted and promised to pay. It is said there could be no legal liability for duties, because no duties can be "collected, levied, and paid" as duties unless the merchandise is in the possession and control of the government; as soon as property is fraudulently withdrawn, the power to collect duties ceases, and fines, penalties, and forfeitures are imposed. But the law is otherwise. Duties are not simply a charge upon the merchandise to be collected by means of the custody of the property only; they are also a personal charge against the importer—a debt created by law which may be collected by a civil action wholly irrespective of the possession and custody of the goods. U. S. v. Lyman [Case No. 15,647]. Here cigars, on which the duty was $34,834.50, were actually imported by these parties, who were liable as importers for such duties, and who discharged that liability by the payment of the fund in question, while the liquors were bought by them in bond sub-

ject to duties, sufficient in amount, as they themselves admitted, to make up the balance of the $59,722, and which they became also liable to pay when they withdrew the merchandise for consumption, as they subsequently did.

Again, it is said that there was no liability for duties so far as the liquors were concerned, because the goods had been taken out of the bonded warehouse on bonds to deliver them to a manufacturing warehouse, whereby the right to duties was lost, and the only subsisting liability was for damages upon the bonds. But the evidence shows quite plainly that the ostensible transfer to the manufacturing warehouse which was owned by these same parties, was simply a cover for the fraud. The real intention of the parties, when the goods were bought, was to withdraw them and·put·them upon the market without payment of duties, and that intention was successfully carried out by means of the ostensible transfer to the manufacturing warehouse. The whole was but one single connected enterprise, namely, the withdrawal of these dutiable goods for consumption without payment of the duties. Furthermore, if this $59,722 in gold be not duties, what is it? It is said to be penalties prescribed by the act of Aug. 6, 1846, but the penalties provided by that act are a fine of $5,000 or imprisonment in the discretion of the court, and a penalty of $1,000 for opening the warehouse and getting access to the goods in the absence of the custom-house officer. If the latter penalty was ever incurred by these parties, which is by no means clearly shown, it forms the portion of the fraud consisting of the $32,000 in currency and is not the gold. Besides, what act prescribes a penalty in gold? But the fund in court is said to be a single amount paid by virtue of the duress of the civil and criminal proceedings; and therefore that no part is duties. Now, an exaction, not based upon a legal liability, paid to avoid the exposure and punishment likely to follow a criminal prosecution, is what is characteristically called in common parlance "hush money." If such were the character of this fund it would not avail the customs officers and informers, for they are by law entitled to a certain share of lawful fines, penalties and forfeitures, imposed and collected by virtue of provisions of law. No statute gives them any right to any portion of irregular exactions. But to suppose the secretary of the treasury, or the solicitor or the district-attorney to have consented to such an exaction from offenders like these, is to impute a gross dereliction. No such supposition is necessary to determine the character of this gold, for the evidence sufficiently shows that it was demanded as duties—was due as such, and was so paid. It must accordingly be distributed as such.

In dismissing this branch of the case I may properly add that the action of the secretary of the treasury in making the agreement which he did with these offenders, and which was severely criticised upon the argument as an attempt to deprive the customs officers and informers of their legal rights, does not appear to me to be capable of such a construction. If such an intention were disclosed by the proofs, it would receive no support at the hands of this court, for the rights which the law gives to informers and to customs officers, in order to insure a better enforcement of the revenue laws, are rights which are entitled to be carefully protected, both by officials and courts. I discover no such intention in the action of the secretary, but only an effort to obtain for the government as great a portion of the duties legally due it as was possible by the method adopted. Whether a vigorous prosecution of the civil action for the $400,000 of duties supposed to have been lost, and the proper criminal punishment of the offenders for their crimes, together with an enforcement of the forfeitures incurred would not have been a method more likely to secure obedience to the law in future is, perhaps, open to question, and it may be that such a' course would have realized in addition to these duties, a larger amount of penalties and forfeitures than the $32,000 which was paid; but the abandonment by the officers of the government of the prosecutions for penalties and forfeitures, although it may have been irregular or injudicious, can have no effect to change the character of a payment of duties, which is shown to have been made in discharge of a subsisting liability to such duties. My conclusion upon this branch of the case therefore, is, that the customs officers and informers have failed to show themselves entitled to a distributive share of the $29,861 of gold now in the registry.

There remains only to determine who are the informers entitled to the $8,000 of currency which has been substantially conceded to be penalties distributable to the informers; the other quarter of the $32,000 in currency having been, as before stated, paid over to the collector as penalties in which he was entitled to share. The persons claiming to be the informers are, J. W. Wiggins, D. H. Burtnett, and J. W. Heffelin; on the one hand, who claim one quarter of the whole amount of penalties, and E. D. Webster, George T. Moulton, and J. S. Beecher on the other; the latter persons do not present for the decision of the court any issue between themselves, but have consented that whatever may be·found payable to any of them shall be paid to the attorney who represents them all. They do, however, dispute the right of Burtnett, Wiggins or Heffelin to any share as informers.

I have examined the voluminous evidence bearing upon this question with care, and while I am satisfied that Wiggins procured valuable evidence, and Burtnett and Heffelin evidence still more important, tending to make out a strong case against the offenders without which, indeed, it is doubtful whether any considerable sum would have been realized from them, and although it seems to me not consistent with justice that Burtnett, who spent much time, and expended some money in ferreting out the details of the fraud and in finding the property, which was attached as the property of Henry Hart, still I am unable to adjudge either Burtnett or Heffelin or Wiggins to be legally

entitled to share in this fund as informers. Their action cannot be said to have induced the prosecutions which were instituted. The fraud was discovered by others. Proceedings were commenced in pursuance of that information, and the clue to the parties was obtained before either Wiggins or Burtnett or Heffelin gave any information; what they did was to furnish evidence tending strongly to confirm the truth of the statements of the informers. The informer is he, who, with the intention of having his information so acted upon, first gives information of a violation of law which induces the prosecution and contributes to the recovery of the fine, penalty, or forfeiture, which is eventually recovered. Sawyer v. Steele [Case No. 12,406]; Bank v. Bangs, 2 Edw. Ch. 105; Lancaster v. Walsh, 4 Mees. & W. 16. In the present case information had been given of these frauds, upon which positive and effective action was taken and which contributed to the recovery of the $32,000, a considerable period before either Wiggins or Burtnett or Heffelin gave any information at all, and such first informers, who were Webster, Beecher and Moulton, are the legal informers entitled to informers' share of this fund. In accordance with these views a decree must be entered adjudging that E. D. Webster, Rodman G. Moulton, and John S. Beecher, are entitled as informers to the $8,000 currency in the registry, and that the United States is entitled to the $29,861 in gold.