## UNITED STATES OF AMERICA *v.* JAMES F. FIND-LAY, T. CLIVE DAVIES AND W. H. BAIRD .

### January 20, 1913.

1. *Evidence—Parol evidence rule—Extrinsic evidence to show bond's legal object:* In a suit on a bond, though the bond may be capable of being read as contemplating an unauthorized arbitration, yet when extrinsic facts would show the intent of an authorized submission to a government officer for remission of penalties under Rev. Stat. sec. 5294, as amended, such facts are admissible in evidence, in order to effectuate the bond when that may be done without varying its terms.

2. *Public officers—Power and authority—Submission to arbitration:* United States officers have no authority, in the absence of statute, to submit to arbitration a controversy as to the fact of violations of law.

3. *Same—Same—Penalties—Remission proceedings—Requirement of bond from applicant:* The Secretary of Commerce and Labor has authority, under Rev. Stat. sec. 5294, as amended, to exact or accept from an applicant for remission of statutory penalties, a bond to secure payment thereof in case of the application's disallowance.

4. *Estoppel—To deny public officer's authority—Penalty-remission proceedings:* A ship's master violating the Passenger Act of 1882, 22 Stat. 186, as amended, who on his own request and for his own advantage obtains clearance of his vessel under bond for payment of "such penalties as may be determined by the Department (Secretary) of Commerce and Labor to have been incurred," on submission of the facts, and whose pursuant submission admits the violation but sets up alleged extenuating circumstances, is estopped to deny the submission to be an application for remission of penalties within the Secretary's power under Rev. Stat. sec. 5294, as amended, when, otherwise, the master and his ship would escape satisfaction of such penalties.

5. *Statutes—Revised Statutes—Conflict with preexisting laws:* In interpreting the Revised Statutes, resort may not be had to original antecedent acts of Congress except in case of ambiguity of the revision.

6. *Penalties—Remission proceedings—Bond:* As above, paragraphs 1, 3, 4.

7. *Shipping—Violation of regulations—Remission of penalties:* As above, paragraph 4.

*At Law:* Action of debt on bond.

R. W. Breckons, U. S. District Attorney, for plaintiff.
C. H. Olson and I. M. Stainback (Holmes, Stanley & Olson with them) for defendants.

CLEMONS, J. This is an action of debt to recover $7,960, on a bond of the defendant Findlay, master of the British steamship Orteric, as principal, and the defendants Davies and Baird as sureties, conditioned upon the payment to the United States of America through the collector of customs at the port of Honolulu, of such penalties as, in the language of this instrument, should "be determined by the Department of Commerce and Labor to have been incurred by the said master" by reason of alleged violations of the Passenger Act of 1882 as amended (hereinafter referred to as the Act), 22 Stat. 186; Act of Feb. 14, 1903, sec. 10, 32 Stat. 829; Act of Feb. 9, 1905, 33 Stat. 711; Act of Dec. 19, 1908, 35 Stat. 583. By stipulation in writing the case was submitted to the court for determination without a jury. From the evidence the facts appear as hereinafter set forth.

On arrival of the British steamship Orteric at the port of Honolulu, April 13, 1911, on a voyage from Oporto and Gibraltar, carrying passengers composed mainly of Portuguese and Spanish immigrants destined for Hawaii, an examination of the vessel was made by customs officers assigned to that duty by the collector pursuant to the provision of the Act, section 11. This inspection resulted in a report of April 17, disclosing violations of the following sections of the act: 2, relating to berths; 3, light and ventilation; 4, food; 5, hospitals; 6, discipline and cleanliness; 7, posting of notices prohibiting ship's company from visiting steerage quarters. Immediately the collector gave written notice to the master of his liability to penalties in respect to the ship Orteric for these violations, specifying them in detail, and also for violations of section 9 relating to passenger

manifests. Moreover, this notice stated the maximum penalty in each instance, offering an opportunity to "present any statements desired," and directed attention to section 13 of the act providing a lien upon the offending ship for these penalties. Thereafter the local agents of the Orteric directed to the collector a letter dated April 22, requesting him to cable to the Secretary of Commerce and Labor (hereinafter called the Secretary) for permission to grant clearance to the Orteric "upon a satisfactory bond being furnished for the payment of any penalties which may be imposed in respect to the alleged violations of the Passenger Act by that steamer, . . . full particulars regarding the matter to be furnished to the Department of Commerce and Labor for their determination of what shall be done in connection therewith." On the same day the agents had already directed another letter to the collector, making "application for clearance of the said steamer for Virtoria, British Columbia," and "in view of the alleged violations" offering to "furnish an adequate bond covering the same, providing that the facts concerning such alleged violations be submitted to the Secretary . . . for determination." The collector, by cable, notified the Secretary of the application for clearance "under bond covering alleged penalties" and recommended "favorable consideration," to which the acting Secretary replied by cable of April 22, "With approval United States attorney clear Orteric, fifteen thousand dollar bond." The bond in suit, for this amount, was thereupon executed and by the United States attorney was "approved as to form and sureties." The bond recites, by way of introduction, the collector's notice to the master of the latter's having "incurred certain penalties on account of alleged violations" of the act, and the department's authority to the collector to grant immediate clearance upon the furnishing of an approved bond "to insure the payment of such penalties for such violations aforesaid as shall be determined by the department . . . to have been incurred by the said

master after the presentation within a reasonable time, by, the said master, or his agents or attorneys, and the officials of the United States at Honolulu, of the facts, to said department." The condition of the bond is the payment by the master to the United States through the collector, of "the amount which the Department of Commerce and Labor of the United States shall, upon such presentation of facts, determine that the said principal is liable for on account of such penalties so alleged to have been incurred." Upon delivery of the bond to the collector, on April 23, clearance was granted forthwith.

Thereafter the Honolulu attorneys for the master sent to the collector, a letter dated April 27, in which "in order to preserve the rights" of their client, they "formally protest against the imposition of the penalties aforesaid and all penalties whatsoever that may be imposed on account of alleged violations" of the act, but promise to file with the collector as soon as possible "a full statement of the facts concerning the said alleged violations, to be submitted to the Department of Commerce and Labor in order that it may arrive at a proper determination of the matter."

After some extention of time granted to the master for his submission of facts, the collector, on June 14, received from the Honolulu attorneys a letter "submit(ting) for presentation to the Department of Commerce and Labor," the affidavits of the master, the chief officer, the ship's doctor, and one of the nurses of the Orteric, and "copies of notices in the English, Portuguese and Spanish languages, which were posted according to the above mentioned affidavits as required by said section 7 of the Act, and which the master's attorneys state were "obtained" by them "on board the S. S. Orteric from the captain and chief officer thereof." Also, this letter promised an endeavor to have the owners furnish the department with a copy of the ship's plans and specifications referred to in the master's affidavit, and asked permission to submit a supplementary presentation of facts

concerning the alleged violations of section 3, as to ventilating apparatus, by affidavit or affidavits to be secured immediately upon the return of a Mr. Campbell who was to arrive in Honolulu on June 16, and who was expected to establish the fact of inspection and approval of the ventilating apparatus at the port of clearance by emigration officers. There is no evidence before the court, however, that any submission of the plans and specifications, or any supplementary presentation of facts as to ventilating apparatus, was ever made. A summarization of the affidavits follows.

Section 2, Berths: The master admits the violation of section 2 of the act in that all single male passengers were, after March 5, not berthed in the fore part of the vessel in a compartment separate from the space or spaces appropriated to other passengers, but on account of a riot between the Spanish and Portuguese male passengers it was "in order to maintain discipline and prevent bloodshed . . . deemed mandatory to segregate the Portuguese passengers from the Spanish passengers, and therefore the affiant removed said Portuguese male single passengers from said compartment in the fore part of the said vessel aft."

Section 3, Light and Ventilation: The master does not attempt to show the ship's provisions for light and ventilation to have conformed with the requirements of the act but deposes to his "belief that ventilating devices in each compartment occupied by passengers . . . were equal in capacity and utility to the ventilating specifications set forth in section 3 of the Act, . . . as will be more particularly shown by a copy of the plans now in possession of . . . the owners of said steamship, and the specifications attached thereto, to be supplied for use in connection with this affidavit" (but, as above stated, not supplied). On the contrary, the master attempts to bring the case within the concession made by this section of the Act, that "in any steamship the ventilating apparatus provided, or

any method of ventilation adopted thereon, which has been approved by the emigration officers at the port or place from which said vessel was cleared, shall be deemed a compliance with the foregoing provisions." In this behalf, he deposes, "that on the 21st day of February, 1911, the said steamship was cleared from the port of Oporto in Portugal, . . . ; that on the day preceding about 10 Portuguese officials, among whom affiant believes were included Portuguese emigrant officials, carefully inspected the said steamship, . . . with reference to construction, equipment, food supply and ventilation, and [the said steamship] was approved in all such respects and otherwise by all of said officials." As to water closets the master deposes "that there were sufficient closets in number in proportion to the number of passengers according to the requirements of said section 3, . . . all enclosed, some of which were located on one side of the upper deck . . . and the others on the other side of said upper deck." Nothing is said as to the closets being "properly enclosed and located" or "kept and maintained in a serviceable and cleanly condition throughout the voyage," within the provisions of the Act, though these were subjects of complaint by the collector, and though the point to which the affidavit is especially directed, sufficiency in number of closets, is not made by the collector at all but is conceded by his letter of April 17, and therefore called for no reply or statement in behalf of the ship. Moreover, the benefit of official inspection is not by the above exception extended to the matter of closets.

The affidavit's introductory statement should here be noted, "that on the 24th day of February, 1911, the said steamship left Gibraltar with about 1,500 Spanish and Portuguese emigrant passengers aboard whose destination was Honolulu, . . . that about 550 of said passengers were Portuguese and the remainder Spanish;" and it should be noted that nothing is said as to whether some of these passengers were taken on at Gibraltar—in which case a new

and favorable inspection would be required, to bring the case within the benefit of the above exception. The above-mentioned report of the inspectors was in the hands of the Secretary for consideration in this case; it shows that 1,000 of the passengers were taken on at Gibraltar after there had been taken on at Oporto, three days before, but 300 passengers, and at Lisbon, two days before, only 252 more. So the master, while claiming exemption, has failed to show that he is within the proviso of section 3,—indeed, has apparently attempted to mislead the Secretary by such a suppression and perversion of facts as would imply an inspection after *all*, instead of about a third of, the passengers had been taken aboard.

Section 4, Food: The master here also deposes by way of concession and justification, or confession and avoidance, "that while milk for infants and children was served regularly only twice a day, nevertheless mothers of such infants and children were at all times supplied upon application with condensed milk at other times, and often served at irregular times without application."

Section 5, Hospitals: The master deposes that the hospital compartments were "ventlated by large skylights and portholes," but does not meet the complaint that the ventilation was insufficient. He also deposes to the utilization as hospitals of two large compartments aggregating more than 1,500 square feet, but gives details showing that the access of air was not direct and was cut off in rough weather. On this point the affidavit appears to dodge the question of the suitability of the regular hospital and to attempt to divert attention therefrom to two special make-shift hospitals.

Section 6, Discipline and Cleanliness: The master makes no denial of the alleged filthy condition of the ship, but deposes that he, the chief officer, the ship's doctor, and an interpreter, almost every day, and one or more of them every day, inspected the ship and passengers and "warned

and directed the passengers to keep themselves in a cleanly condition and to stay on the upper deck as much as possible," and "directed said passengers to air their baggage and bedding whenever the weather would permit, but with few exceptions the said passengers refused to do so, stating that they feared their belongings would be stolen;" and he deposes that on account of the great number of passengers, the crew could not air the bedding and baggage without the passengers' assistance, and that at all times the crew "was engaged in cleaning the decks and compartments and did all in that respect that could reasonably be done." The master thus, in effect, regards the statutory duty of the ship as performed by its officers merely directing the passengers to maintain cleanliness  The ship's condition of disorder and filth on arrival at Honolulu is attributed to excitement of the passengers in view of the approach of land and end of the voyage,—who threw the remnants of their breakfast about the floors and decks, instead of overboard as they had customarily done theretofore, and also to the tearing of cloth from mattresses in order to make bags for their belongings, with consequent scattering of the mattress-stuffing.   And it is stated, that it was at the collector's direction that the ship was left in this condition for several days after docking,—a precaution, by the way, which enabled the inspectors, and the grand jury who also visited the ship, to see conditions in statu quo.

The master then deposes to the posting of copies of section 6 of the Act, in the Portuguese and Spanish languages, in all of the companionways and in various parts of the vessel; but states that in the course of the voyage many of them were torn down by passengers, and that such notices were again posted about two weeks before reaching Honolulu; also that very few of the passengers could read,—as if the Act made this posting at all dependent upon the literacy of the passengers.

Section 9, Passenger Manifests: The master admits that

"the shifting of the passengers in order to segregate the Spanish from the Portuguese, resulted in some confusion, making it impossible for affiant to include in the list of passengers the exact compartments and spaces occupied by them thereafter."

The affidavit of the chief officers "confirms . . . in all respects" the affidavit of the master, as does the affidavit of the ship's doctor. The doctor also deposes that all compartments and decks were swept not less than twice daily, and were treated daily with a suitable disinfectant; that he would not permit the washing of apartments occupied by passengers because in his opinion and from the experience of physicians in charge of emigrant vessels, such washing results in unavoidable dampness highly detrimental to health. He deposes that "any and all accumulations . . . were rendered physically harmless and innocuous by disinfectants," and "the sleeping apartments were scraped with shovels every day and swept," and "most of the litter found on board . . . at Honolulu, was the result of food and rubbish and the contents of mattresses being thrown or strewn about the deck by the passengers in their excitement and haste to land." He says that "the temporary or additional hospital quarters . . . were, in the opinion of the affiant, well suited to that purpose considering the circumstances," but though deposing that he "directly superintended all of the sanitation and sanitary measures," he says nothing about the regular hospital and its ventilation. "The mortality on board said vessel," he attributes "very largely to the concealment by parents of the ailments of their children and their refusal to submit them to medical treatment." "While," as he says, "milk was served regularly only twice a day, nevertheless condensed milk was served at irregular times each day to the mothers for the use of such children, both upon application and without application;" "constant inspection was made by affiant, and milk supplied in all cases where it was found necessary,"

and "a quantity" (stating it) of condensed milk was provided "ample for the requirements of the children and nursing mothers." "The water supply for bathing and washing of said passengers was unlimited, and the usual accommodations for washing existed."

One of the nurses deposes that "she assisted throughout said voyage in caring for the passengers who were ill and for infants; that milk was served twice daily regularly . . . and at irregular times in addition whenever desired by the mothers of infant children and also whenever it appeared necessary to the hospital staff; that affiant believes that milk in ample quantities was served at all times." Her statements as to hospitals and ventilation are the same in substance as that of the master, whom she also confirms as to the riot and the consequent segregation of Portuguese and Spanish.

The collector thereupon, on June 17, forwarded to the Secretary, the master's showing of affidavits and copies of posted notices, and the collector's own showing which consisted of the bond in suit, the above-described letters and cablegrams (by original or copy), also the inspector's report of the vessel's condition, and a letter of the collector to the United States district attorney at Honolulu dated April 17, transmitting this report and calling attention to the violations of the Act, a letter (copy) of April 18 of the Portuguese consul at Honolulu to the governor of Hawaii protesting against the insanitary conditions of the vessel, the report (copy) of the grand jury for the April, 1911, term of this court adverse to the master on the same points as covered by the above-described letter of the collector to the master. And a few merely formal and immaterial letters of acknowledgment and of transmission between the collector and other officials were included among the papers presented to the Secretary. He also had before him a letter directed to the department by the Washington attorney for the owners, dated April 22, but not received until two days

later, and perhaps of no bearing on the question of the object of a bond the negotiations for which had already been consummated by others, and the leading, attorneys in the matter at Honolulu, but which in fairness to the respondents should nevertheless be mentioned as possibly not so equivocal as the bond and the preceding Honolulu correspondence, and as more clearly capable of being read as contemplating some kind of an "adjudication," i. e., arbitration, by the Secretary. Though, under all the circumstances, the conclusion is inevitable that, even if this letter did imply an arbitration, it would not express the actual object of the negotiations. This conclusion is borne out by several considerations. In the first place, the Washington attorney had no part either in the preparation of the bond, or of the submission pursuant thereto, i. e., of the matter which the bond was intended to cover and which would indicate the bond's purpose; and it may be fairly found from the evidence, direct and circumstantial, that any light of his statements would be at most no more than dimly reflected light. Even giving his use of the word "adjudication" a strict sense, certainly not called for by any controlling fact or presumption of fact or of law (but quite the contrary), he, still, was not in as good position to characterize the proceedings as were those others who were active in the actual negotiations and on the field, and whose request for clearance discloses that the object of the proposed submission of "full particulars regarding the matter," was the Secretary's "determination of *what shall be done in connection therewith*" (agents' letter of April 22, above). Furthermore, while it might be a possible, though it is by no means a necessary, nor even the probable or reasonable, inference from the Washington attorney's letter of April 22, that it was he who had the first advice and direction from the owners of the vessel and so himself initiated the proceedings; still it is important to repeat that the Honolulu attorneys were the ones on the ground and that it was

really their application for clearance, or that of the local agents under their guidance, which was acted upon, and not the application of the Washington attorney, whose letter, as suggested above, did not reach the department until two days after the vessel had cleared,—sent on a Saturday and not received until the following Monday (as shown by the department's receipt stamp on the face of the letter). Also, after the submission to the Secretary this attorney, though specially requesting by letter of July 11, further time for presentation of a "written brief of his contentions" to be "supplement(ed) . . . by a verbal presentation" of "the points which he desires the Department to consider," nevertheless failed to present any defense of the master or any argument in support of a defense,—indeed, did not appear at all, as he would naturally have done if the consideration of the Secretary had been quasi-judicial instead of executive, i. e., in the nature of judgment on disputed facts rather than of pardon for admitted acts.

This letter of April 22 recites the vessel's detention for alleged breaches of the Act, the details of which are unknown, and in view of the time required for this attorney and the Secretary to fully ascertain the facts and of the urgent importance of minimizing delay (as a cargo waited at Seattle), requests the department to instruct the collector by cable to report by cable "the cause of the detention with such details as may be necessary to enable the department to act on the owner's request, which is that permission be granted to the vessel to proceed on her voyage "upon her master or Honolulu agent entering into bond for the making good of any penalty found to be due either by the vessel or the master, and that upon the coming in of a formal report of the matter the questions involved be then adjudicated upon after a hearing."

The collector, in his letter of June 17 transmitting the papers in the case, reported penalties aggregating $7,960, as follows: "Section 2, $5 for each statute passenger,—1,242

@ $5,—$6,210; section 3, penalty of $250; section 4, mis-
demeanor reported to United States attorney; section 5,
penalty of $250; section 6, penalty of $250; section 7, mis-
demeanor reported to United States attorney; section 9,
penalty of $100." And it will be observed that in the con-
sideration of the case, no action was taken as to the viola-
tions of a criminal nature, alleged in the collector's letter
notifying the master of his liability, namely, breaches of
sections 4 and 7 of the act, which are misdemeanors.

On December 4, 1911, the acting Secretary directed to
the collector a letter in this matter, which he characterizes
as "the application of James Findlay, master, for relief from
the penalties incurred in the case of the steamer Orteric
for violations of the Passenger Act," namely, sections 2, 3,
5, 6 and 9, but not sections 4 and 7 involving misdemeanors.
After reviewing at length the report of the grand jury, the
acting Secretary concludes:

"From the papers submitted it is evident that this vessel
with 1,242 [statute] passengers was navigated on a voyage
of eight weeks under all conditions of weather in violation
of practically all of the provisions of the Passenger Act
having to do with the health, comfort, and well-being of the
passengers. The death of 57 children during the voyage
marks this as the worst case ever submitted to the Depart-
ment. The sexes were not properly segregated during a
large portion of the voyage, the master stating that the con-
fusion was such that it was impossible for him to state in
the manifests the exact compartments and spaces occupied
by the various passengers. The ventilation of the ship
appears to have been wholly inadequate, this lack of ven-
tilation in the opinion of the grand jury, increasing the rate
of mortality. Ill ventilated hospital facilities without ade-
quate equipment were furnished; the manifest of the vessel
was not completed, and the sanitary conditions of the vessel
were inexcusable. The Department concurs in the follow-
ing extract from the report of the grand jury:

" 'We cannot emphasize too strongly the necessity for the
observance of the regulations requiring vessels to be kept
in a clean and sanitary condition. When poor immigrants,

perhaps accustomed to modern methods of sanitation, are brought into a tropical climate such as Hawaii, not only their own good, but the good of the community in general is subserved by a rigid insistence on compliance with the law.'

"In the opinion of the Department, penalties aggregating $7,960 were incurred in this case for violation of the sections enumerated and it declines to intervene in behalf of the offenders."

Due notice of this determination was given to the principal and sureties and demand made for payment of $7,960 covering the above penalties, but such payment the obligors have refused and neglected to make.

[1a] When the action came on for hearing, the evidence first submitted consisted merely of the execution and delivery of the bond, the determination of the acting Secretary, notice thereof to the obligors and demand for payment, and the breach of the bond's condition,—all on the theory that the undertaking was in any event valid as a common-law obligation. After study of the case as thus submitted, I came to the conclusion that the bond could not be sustained on its face, so far as concerned the possibly apparent (but not necessarily exclusive) nature of the condition as one for the payment of such sum as the department, or its chief officer, should determine on an *arbitration;* in other words, the bond on its face seemed capable of the implication, and this the first apparent or natural implication, of such action by the Secretary as would amount to the exercise of judicial functions: i. e., an arbitration between the United States and the master of the Orteric, in which, also, the arbitrator was an executive officer not only of the government but of the department particularly interested. Accordingly, at the court's suggestion, the government moved to reopen the case for the introduction of further evidence, to show the exact nature of the whole transaction between the representatives of the vessel and the officers of the government. Also, in the consideration of the evidence,

a suspicion arose, from the opening statement of the acting Secretary's letter of December 4, characterizing the proceedings as an *"application for relief* from penalties incurred," as well as from his concluding statement of *"declin(ing) to intervene* in behalf of the offenders," that the bond contemplated not an arbitration of any controversy, not a quasi-judicial determination of disputed liability for penalties, but a proceeding for remission of penaltes, or at least for relef from the legal effect of admitted acts, done, however, under alleged extenuating circumstances.

In fairness, it should be said, here, that any conclusions of this opinion, as to the character of the proceedings, are based entirely on what was done therein by the master and his witnesses and attorneys, their "practical construction," and not in the least on the acting Secretary's characterization of the proceedings in his letter of December 4,—which characterization is, for our purposes, assumed to be mere irrelevant opinion, or hearsay; though without committing myself to an opinion either way, it is possible that something could be said in support of its evidential value. No contention is made on behalf of the obligors that the collector ever regarded the proceedings as anything but a submission for mitigation; and any such contention would be contrary to the express language of his letter of June 17, transmitting to the department the showing in behalf of the respective parties.

The motion to reopen was granted, and over the objection of defendant's counsel on the ground of violation of the parol-evidence rule;-the facts other than those proved at the first hearing were disclosed as above set forth. This extended review of the whole transaction has seemed necessary in fairness to all parties, and also advisable in order to make the reasons for my conclusions fully understood.

This course of hearing further evidence was taken deliberately, and seemed an enlightened application of the parol-evidence rule, within the rational limits marked by Mr.

Wigmore.  See Wigmore on Evidence, sec 2462, pp. 3476, 3477; sec. 2463, p. 3488; sec. 2465, pp. 3490, 3492; sec. 2470, p. 3499; 5 Id., sec. 2462, note 8.  In the language of Mr. Wigmore's Pocket Code of Evidence, "The ultimate standard of interpretation is the sense employed by the party or parties doing the legal act," sec. 1958, rule 222, and in resorting to the "species of usage" which may be employed "in ascertaining this ultimate standard," the court may adopt even "a sense variant from that of general usage," upon being "persuaded (1) that such sense exists in some special or personal species of usage and (2) that the party was employing that other species of usage," secs. 1959-1960; and "the sense supplied by general usage, and provisionally adopted," —["as a means of attaining (not of supplanting or of competing against) the ultimate standard, namely, *the sense actually used by the party or parties* to the act,"]—"must be rejected, as soon as it is made to appear that there exists some other sense in a special or personal usage which was followed by the party or parties in the particular case," sec. 1961, with sec. 1960 interpolated.  Indeed, Mr. Wigmore in his edition of Greenleaf on Evidence, uses the language of Professor Thayer to suggest as "natural" a " 'free and full range among extrinsic facts in aid' " of "the process of interpretation."  1 Greenleaf on Evidence, 16th ed., sec. 305 j; and see Id., sec. 305 k.  By this test, it appears to my satisfaction that the parties did not intend a submission in the sense in which the words of the bond might naturally be first taken, i. e., a submission of facts with the object of a determination of the master's guilt or innocence of the law's violation,—an arbitration, but that the parties had in view a submission of facts with the object of a remission of the penalties to which the actual violation of the law had made the master confessedly liable.  And not only do the facts, admitted over counsel's objection, support this reading of the bond, but also the presumption of right-acting (the most universal presumption of life) leads me to disregard

the superficial or first-apparent sense of the bond's lan-' guage. For, to posit an arbitration is to read the bond as contemplating an unauthorized act. *Hobbs v. Mcean,* 117 U. S. 567, 575-576; *Delaware &c. R. Co. v. Kutter,* 147 Fed. 51, 62; *United States Fidelity, &c. Co. v. Board of Com'rs.,* 145 Id. 144, 148-149; 17 A. & E. Enc. L. 2d ed. 17-18. And see *Cooke v. Graham's Admr.,* 3 Cranch, 229, 235, in which Chief Justice Marshal declares that in "many cases on the construction of bonds, . . . the letter [even] of the condition has been departed from, to carry into effect the intention of the parties."

[2] As a general rule in the absence of an enabling statute, public officers are without authority to submit to arbitration a controversy in which the government is a party. In support of this proposition, a mere reference must suffice, to the following authorities as in point or suggestive: *Jones v. Howard,* 4 Mich. 446, 448-449, for the general principle that "officers who are created by statute must confine their acts within its provisions;" Mechem on Public Offices and Officers, sec. 511 and n. 5, secs. 505-507; the valuable decision of Circuit Judge Woodbury in *United States v. Ames,* 1 Woodb. & M. 76, 24 Fed. Cas. 784, 789-790, No. 14,441, applying this principle to an arbitration-submission; Morse on Arbitration, 30; *Child v. United States,* 4 Ct. Cl. 176, 184; *District of Columbia v. Bailey,* 171 U. S. 161, 176, in which Mr. Justice White, though viewing liberally the contractual capacity of certain officers as implied from other recognized powers, yet holds that the "mere absence of a statutory inhibition" is in general no justification for the exercise of the power of submission, but that the officer must first have his authority from that legislative body (municipal, state, or national) which is his guardian if not his parent; *Benjamin v. United States,* 29 Ct. Cl. 417, 419; *Child v. United States,* supra. See *Brannen v. United States,* 20 Ct. Cl. 219, 224. (It is worth while to note in passing that the value of the Court of Claims reports as a

source of authority on many phases of the powers of public officers, has apparently been overlooked by the courts and law-book writers.)   And the reasoning of the decisions on the power of public officers to compromise, would seem to add some support to the principle, applied in the above-cited cases to the power to arbitrate,—regardless of distinctions between compromise and arbitration.   See, e.g., the opinion of Judge Benedict in *United States v. George,* 6 Blatchf. 406, 25 Fed. Cas. 1277, 1279-1280, No. 15,198.

It may be observed by the way that the violations of statute out of which the mooted transaction arose, though close to the border-line of the quasi-criminal, are nevertheless the subject of a civil action for recovery of the penalties incurred (*Jacob v. United States,* 1 Brock. 520, 13 Fed. Cas. 267, No. 7,157; *Stearns v. United States,* 2 Paine, 305, 22 Fed. Cas. 1188, No. 13,341; *Boyd v. Clark,* 13 Fed. 909; 16 Enc. Pl. & Pr. 231-239), especially if the parties so choose to regard them (see *Moller v. United States,* 57 Fed. 490, 495); so that the bond would not be held invalid on the score of a prohibited arbitration of a subject of criminal prosecution (2 A. & E. Enc. L., 2d ed., 557-558; 3 Cyc. 595; 5 Enc. L. & P. 38).

Also, it should be noted that, assuming an arbitration for purpose of discussion, the fact of the arbitrator's being practically one of the very parties, or at least the agent of a party, does not in any way control my view of the bond on its face; for the principal under the bond has waived any objection of disqualification for interest, because he has, of course, entered into the obligation with full knowledge of the arbitrator's being an agent of the government.   2 A. & E. Enc. L. 2d ed. 637; 3 Cyc. 619; 5 Enc. L. & P. 88.   See 3 Cyc. 617, n. 48.

Furthermore, even if there were plausibility in the argument made in behalf of the obligors, that the giving of a bond was enforced by circumstances (the urgent importance of getting the ship away for its waiting cargo, etc.), i. e., the

claim of duress, involuntariness, such argument is quite untenable under the facts of the case, for it was the obligors themselves who proposed and urged this very procedure, and for their own convenience.

But we now come to the points which are more seriously regarded as vital. The district attorney insists that, in any event the bond, even if it contemplated arbitration and not penalty-remission, is good on its face as a common-law obligation, and maintains that the granting of clearance of the vessel, at the request of the master, constitutes a good consideration to support this obligation. This argument cannot be permitted to stand in the face of the rule that public officers are without authority to submit to arbitration. It is illogical, futile, to lay down such a rule of restraint, and then hold that, in spite of any want of power, an unauthorized act may be given effect by the officer's exaction or acceptance of a bond covering that act. This appearing to be a sound, indeed the only possible, application of the rule, the mere fact of there being a just consideration, in the grant of the requested clearance, cannot be urged to the rule's undoing. An extreme illustration may make this more clear: if the fact of a *quid pro quo* in the grant of clearance may justify an unauthorized submission to arbitration in these "civil" infractions of the Passenger Act, it might equally well justify a submission to arbitration of alleged criminal breaches of this statute punishable by imprisonment, e. g., under section 4. And, of course, the argument is not sound, according to one of the most elementary principles of the law of contracts. Anson's English Law of Contracts, 2d Amer. ed., by Huffcut, 12, sec. 10, subd. 5; Harriman on Contracts, 2d ed. sec. 228. The argument overlooks the distinction between subject-matter (or object) and consideration; validity of the latter cannot cure illegality of the former. See 1 Page on Contracts, sec. 325.

Moreover, in this argument counsel seems to overlook the fundamental policy of the law relating to the powers of

public officers,—to lose sight of the broad principle of policy in his zeal to see justice done in this particular case. Indeed, there is a conflict of policies here,—the policy of securing in this particular case punishment of the offending ship and master, and the policy in general of not countenancing an abuse of power by a public officer even in a good cause. The former is a matter of insignificance compared with the latter. See Sir Courteney Ilbert's "Legislative Methods and Forms," pp. 38-40; A. Lawrence Lowell's "Governments and Parties in Continental Europe," p. 44; Jeremiah Black, Essays, etc., p. 598; also Letters of Mayor Gaynor, late justice of the Supreme Court of New York, American Magazine, January, 1913, p. 49.

As to the suggestion of an estoppel against the obligors to deny a power in the collector or his superior officer to submit to arbitration (i. e., viewing the bond according to an intention possibly apparent on its face, of an arbitration), it must be remembered that, "estoppel of whatever kind is subject to one general rule, that it cannot override the law of the land: for example, a corporation cannot be estopped as to acts which are ultra vires." 9 Enc. Britt. 11th ed. 801, tit. "Estoppel." And see the pregnant language of *Collins v. Benbury,* 3 Ired. L. (No. Car.), 285, 38 Am. Dec. 722, 726, to the effect that what is merely void cannot estop. It would be of doubtful wisdom as a precedent, though it might be fair enough to the obligors in this particular case, to hold that parties by estoppel can create a power not possessed by a public officer, to submit to arbitration.

[4] The finding has already been intimated, of a submission for the purpose of obtaining remission of the penalties alleged by the collector to have been incurred by the ship and master. Though the submission was somewhat informal,—lacking even a regular petition with prayer for relief, yet I feel satisfied of the truth of the conclusion of fact that the proceeding was intended with a view to obtain-

ing the exercise of leniency.   Such is the only reasonable, satisfactory, answer to the questions:   If the master's showing of facts was not a submission for the purpose of obtaining remission of the alleged penalties, why did he set up extenuating circumstances?   If it was an arbitration of disputed facts which was contemplated, why did the master not show facts in defense, instead of facts in mitigation?

Here is a real estoppel.  If the master has, as I find, actually regarded the proceeding covered by the bond, as a submission for remission of penalties, or led the government's officers from the beginning to so understand his intent, then why seek a principle of law to support a contrary intent?   Furthermore, it is undeniable that the master and his attorneys were endeavoring to avoid liability by reason of alleged extenuating circumstances; and so, in any event, even though it be possible that such circumstances might, as the defendants claim, be adapted to a defense under an arbitration,—though it does not appear that it was ever urged *as a defense,* the department was justified in treating the submission as it did, i. e., as a submission within the authority of the Secretary to consider and pass upon under section 5294 of the Revised Statutes as amended.   Any estoppel in the case lies here; and the fact that the government permitted the vessel to clear and go beyond the reach of its courts and of the local grand jury, supplies the element of "prejudice" or "injury" which would follow denial of such estoppel.   11 A. & E. Enc. L. 2d ed. 436-438; 15 Cyc. 744.   In passing, the grand jury's statements may be noted, that an indictment would have been found but for "the action of the owners of the vessel in frankly submitting the facts to the Department of Commerce and Labor for its determination and agreeing to abide by whatever decision that department might make."

(1b) The objections, made in this court, in behalf of the defendants, to the evidence submitted to the Secretary by the collector, as being hearsay and immaterial, are, it would

seem, untenable. According to my theory of the case, it was proper to see just what was before the Secretary, just what was submitted to him by the parties, so that from the matter submitted a finding might be made as to the character of the submission. See authorities on evidence, supra; also Wigmore's Code, secs. 1969, 1972; _Merriam v. United States,_ 107 U. S. 437, 441; _Rock Island Railway v. Rio Grande Railroad,_ 143 U. S. 596, 609. Objections might technically be well taken not only to the inspector's report, the grand jury report, the official letters, etc., submitted by the collector, but also to the affidavits, the copies of posted notices and the attorneys' letter verifying the source and contents of these notices and the fact of their posting, submitted by the master. But it would be an unwarranted refinement of technicality to give heed now to the complaints of the master who had himself initiated the proceedings and throughout had made no objection but had countenanced their informality. See _Duvall v. Sulzner,_ 155 Fed. 910, syll. 2, 917-918. If I were called upon in this suit to pass upon the soundness of the Secretary's admission of evidence precedent to his ruling on the submission for leniency, I would still hold that the admission of everything submitted by the collector was harmless error, and that the master stood "convicted out of his own mouth" in the affidavit which he himself swore to and presented to the department.

[5] But on this aspect of the case, counsel for the defendants argue that the power of the Secretary to remit is wanting, quite as much as the power of the collector or the Secretary to submit to arbitration; and the earnest contention is that the provision of the Revised Statutes, sec. 5294, as amended, upon which is founded the Secretary's power to remit, does not apply to any other subject than those within the purview of the power of remission given by he original act of Congress, 16 Stat. 458, embodied in this section of the Revised Statutes, to-wit, "any fine or penalty·

provided for in this act," etc.   Now this original act, of
February 28, 1871 (of which section 5294 of the Revised
Statutes represents section 64, entitled "An act to provide
for the better security of life on board of vessels propelled
in whole or in part by steam, and for other purposes," ex-
cepted from its provisions "vessels of other countries," Re-
vised Statutes, sec. 4400, act of 1871, sec. 41, 16 Stat. 440.
And, so, if we must be guided not by what the present stat-
ute, Revised Statutes, sec. 5294, says on its face, but by
what the original statute says, then it is conceded that the
power to remit does not apply to the Orteric, which is "a
vessel of another country."   But the argument overlooks
the provisions of section 5595 and 5596 of the Revised
Statutes, which declare that these Revised Statutes "em-
brace the statutes   .   .   .   in force on the 1st day of Decem-
ber, 1873, *as revised*," and that "all acts of Congress passed
prior" to said date, "any portion of which is embraced in
any section of said revision are hereby repealed, and the
section applicable thereto shall be in force in lieu thereof."
See *United States v. Tucker*, 122 Fed. 518, 523.   Accord-
ingly, in *United States v. Bowen*, 100 U. S. 508, 513, the
Federal Supreme Court held "that the Revised Statutes
must be treated as a legislative declaration of what the
statute was on the 1st of December, 1873, and that when
the meaning was plain the courts could not look to the
original statutes to see if Congress had erred in the revi-
sion,"—which "could only be done when it was necessary
to construe doubtful language."   *Viethor v. Arthur*, 104 U.
S. 498, 499; *Arthur v. Dodge*, 101 Id. 34, 36; *Deffeback v.
Hawke*, 115 Id. 392, 402, in which Mr. Justice Field holds
that "no reference can be had to the original statutes to
control the construction of any section of the Revised Stat-
utes, [even] although in the original statutes it may have
had a larger or more limited application;" *Cambria Iron Co.
v. Ashburn*, 118 Id. 54, 57; *Hamilton v. Rathbone*, 175 Id.
415, 419-420; *The Brothers*, 10 Ben. 400; 4 Fed. Cas. 318,

No. 1,968; *United States v. Sixty-five Vases,* 18 Fed. 508,. 510. The suggestion of Judge Blatchford to the contrary in *The L. W. Eaton,* 9 Ben. 289, 15 Fed. Cas. 1119, 1123, col. 2, No. 8,612, has thus been overruled. See, also, 1 Lewis' Sutherland on Statutory Construction, 2d ed., sec. 271; 2 Id. sec. 450. It is sometimes quite a violent presumption that everyone "knows the law;" and to insist that where the law has been revised the average man shall know not only the law as embodied in the revision but also as contained in all the precedent statutes, would be to make law revision a burden instead of a help. Chancellor Zabriskie some years before had expressed the germ of this truth when he said in *Keyport Steamboat Co. v. Farmers' Transportation Co.,* 15 N. J. Eq. 13, 24, "The only just rule of construction, especially among a free people, is the meaning of the law as expressed to those to whom it is prescribed, and who are to be governed by it." See, also, *In re Suekichi Tsuji,* ante, p. 52. In the statute here in question the language is not doubtful; and, so, we may not look elsewhere, but must read the provision as applying to the remission of penalties under laws relating to vessels, irrespective of the nationality of the vessel concerned. It may be noted that section 5294, as amended, is even broader than originally, now applying to penalties relating to "vessels" instead of "steam-vessels." 28 Stat. 595; 29 Id. 39.

[3] Finally, counsel for the defendants would at all events save their case by the contention, that "even if the Secretary could remit a fine, that would not give him or the collector of customs the power to impose a fine." They say, "no penalty can be imposed upon the master until there has been a judicial determination of his liability,"— and in spite of the bond, the parties are left just where they started. But, we need not take the time to determine whether the collector or the Secretary has the power to "impose" a penalty. See 17 Ops. Atty. Gen. 282, 283-284; 24 Id. 583, 588. Here we have an admission by the master

·of alleged violations of statute: see summary of his affidavit submitted, and discussion thereof, supra; and where a party admits his wrong, as he necessarily must in making an application for remission of penalty (*The Princess of Orange*, 19 Fed. Cas. 1336, 1339, 1340, No. 11,431; *United States v. Morris*, 10 Wheat. 246, 295), I can see no reason nor justice in giving him this extra "bite at the cherry" so that he may have two chances to clear himself instead of the one chance of the usual fair trial by his peers. A reasonable and just view, seems to me to be this: Where the Secretary has the power to remit, he may in order to prevent the wrongdoer's playing fast and loose with him, exact a bond as an assurance of good faith and to secure, in case of denial of remission, full satisfaction of the penalty incurred by him and from which he asks to be relieved. This view finds support in the following cases, among many: *United States v. Garlinghouse*, 23 Fed. Cas. 1258, 1260, No. 15,189; *Neilson v. Lagow*, 12 How. 97, 107-108; *United States v. Hodson*, 10 Wall. 395, 405-408, 409; *United States v. Mora*, 97 U. S. 413, 419-421, 422; *Rogers v. United States*, 32 Fed. 890; *Great Falls Mfg. Co. v. United States*, 18 Ct. Cl. 160, 195. If the case were one of appeal from an admitted judgment of a lower court, but the statute made no provision for an appeal bond, there would not, I think, be the slightest hesitation by any court to hold that it had power to make a rule requiring the appellant to give a bond to secure performance in case of an affirmance of the judgment from which he sought relief. The case here is no different: the power to accept or require such an undertaking is an administrative power fairly and reasonably incident to the power to remit, or refuse to remit, upon consideration of facts presented as the basis for desired remission.

The contention that "no penalty can be imposed" without "a judicial determination of liability," is contrary to the opinion of the highest authority, judicial and executive,

holding that the powers of the Secretary with reference to remission of penalties may be exercised either before or after judgment. *The Laura,* 114 U. S. 411, 416; *United States v. Morris,* 10 Wheat. 246, 295-296; *Peacock v. United States,* 125 Fed. 583, 588; 17 Ops. Atty. Gen. 282, 283-284. See 24 Ops. Otty. Gen. 583, 588.

Wherefore, I find for the plaintiff. Let judgment be entered acordingly.

---

*Affirmed on appeal*: *Findlay v. United States,* 225 Fed. 337. On the particular point of the validity of the bond in suit, the affirming opinion, however, sustains the conclusion of the lower court by a different ground from that taken by the latter, i. e., as a common-law obligation rather than as a "penalty-remission" bond.